# BRUNSWICK CORP. *v.* PUEBLO BOWL-O-MAT, INC., ET AL.

No. 75–904.  Argued November 3, 1976—Decided January 25, 1977

*Bernard G. Segal* argued the cause for petitioner. With him on the briefs were *Ira P. Tiger, Joseph A. Tate, Miles G. Seeley,* and *Thomas B. McNeill.*

*Malcolm A. Hoffmann* argued the cause for respondents. With him on the brief was *Edward A. Woolley.**

MR. JUSTICE MARSHALL delivered the opinion of the Court.

This case raises important questions concerning the interrelationship of the antimerger and private damages action provisions of the Clayton Antitrust Act.

---

*John L. Endicott* and *John J. Swenson* filed a brief for Purex Corp. as *amicus curiae.*

# I

Petitioner is one of the two largest manufacturers of bowling equipment in the United States. Respondents are three of the 10 bowling centers owned by Treadway Companies, Inc. Since 1965, petitioner has acquired and operated a large number of bowling centers, including six in the markets in which respondents operate. Respondents instituted this action contending that these acquisitions violated various provisions of the antitrust laws.

In the late 1950's, the bowling industry expanded rapidly, and petitioner's sales of lanes, automatic pinsetters, and ancillary equipment rose accordingly.[1] Since this equipment requires a major capital expenditure—$12,600 for each lane and pinsetter, App. A1576—most of petitioner's sales were for secured credit.

In the early 1960's, the bowling industry went into a sharp decline. Petitioner's sales quickly dropped to pre-boom levels. Moreover, petitioner experienced great difficulty in collecting money owed it; by the end of 1964 over $100,000,000, or more than 25%, of petitioner's accounts were more than 90 days delinquent. *Id.,* at A1884. Repossessions rose dramatically, but attempts to sell or lease the repossessed equipment met with only limited success.[2] Because petitioner had borrowed close to $250,000,000 to finance its credit sales, *id.,* at A1900, it was, as the Court of Appeals concluded, "in serious financial difficulty." *NBO Industries Treadway Cos., Inc.* v. *Brunswick Corp.,* 523 F. 2d 262, 267 (CA3 1975).

To meet this difficulty, petitioner began acquiring and

---

[1] Sales of automatic pinsetters, for example, went from 1,890 in 1956 to 16,288 in 1961. App. A1866.

[2] Repossessions of pinsetters increased from 300 in 1961 to 5,996 in 1965. *Ibid.* In 1963, petitioner resold over two-thirds of the pinsetters repossessed; more typically, only one-third were resold, and in 1965, less than one-quarter were resold. *Id.,* at A1879.

operating defaulting bowling centers when their equipment could not be resold and a positive cash flow could be expected from operating the centers. During the seven years preceding the trial in this case, petitioner acquired 222 centers, 54 of which it either disposed of or closed. *Ibid.* These acquisitions made petitioner by far the largest operator of bowling centers, with over five times as many centers as its next largest competitor. *Ibid.* Petitioner's net worth in 1965 was more than eight times greater, and its gross revenue more than seven times greater, than the total for the 11 next largest bowling chains. App. A1675. Nevertheless, petitioner controlled only 2% of the bowling centers in the United States. *Id.,* at A1096.

At issue here are acquisitions by petitioner in the three markets in which respondents are located: Pueblo, Colo., Poughkeepsie, N. Y., and Paramus, N. J. In 1965, petitioner acquired one defaulting center in Pueblo, one in Poughkeepsie, and two in the Paramus area. In 1969, petitioner acquired a third defaulting center in the Paramus market, and in 1970 petitioner acquired a fourth. Petitioner closed its Poughkeepsie center in 1969 after three years of unsuccessful operation; the Paramus center acquired in 1970 also proved unsuccessful, and in March 1973 petitioner gave notice that it would cease operating the center when its lease expired. The other four centers were operational at the time of trial.

Respondents initiated this action in June 1966, alleging, *inter alia,* that these acquisitions might substantially lessen competition or tend to create a monopoly in violation of § 7 of the Clayton Act, 15 U. S. C. § 18.[3] Respondents sought

---

[3] The complaint contained two additional counts. Count one alleged that petitioner had violated § 1 of the Sherman Act, 15 U. S. C. § 1, by fixing resale prices for bowling supplies sold by petitioner to respondents. This count was abandoned prior to trial. Count two alleged that by virtue of the acquisitions and other acts, petitioner was guilty of monop-

damages, pursuant to § 4 of the Act, 15 U. S. C. § 15, for three times "the reasonably expectable profits to be made [by respondents] from the operation of their bowling centers." App. A24. Respondents also sought a divestiture order, an injunction against future acquisitions, and such "other further and different relief" as might be appropriate under § 16 of the Act, 15 U. S. C. § 26. App. A27.

Trial was held in the spring of 1973, following an initial mistrial due to a hung jury. To establish a § 7 violation, respondents sought to prove that because of its size, petitioner had the capacity to lessen competition in the markets it had entered by driving smaller competitors out of business. To establish damages, respondents attempted to show that had petitioner allowed the defaulting centers to close, respondents' profits would have increased. At respondents' request, the jury was instructed in accord with respondents' theory as to the nature of the violation and the basis for damages. The jury returned a verdict in favor of respondents in the amount of $2,358,030, which represented the minimum estimate by respondents of the additional income they would have realized had the acquired centers been closed. *Id.*, at A1737. As required by law, the District Court trebled the damages.[4] It also awarded respondents costs and attorneys'

---

olization or an attempt to monopolize in violation of § 2 of the Sherman Act, 15 U. S. C. § 2. The jury found for petitioner on this count, and respondents did not appeal.

The complaint also named as plaintiffs National Bowl-O-Mat, the predecessor to Treadway Companies, and the seven other bowling center subsidiaries of Treadway. These plaintiffs were unsuccessful on all counts, however, and they did not appeal the judgments entered against them.

[4] Judgment ultimately was entered for $6,575,040, which is $499,050 less than three times the jury's damages award, after respondent Pueblo Bowl-O-Mat consented to a remittitur which the District Court proposed as an alternative to a retrial on damages. *Treadway Cos.* v. *Brunswick Corp.*, 364 F. Supp. 316, 324–326 (NJ 1973). The remittitur was deemed necessary because the jury apparently awarded damages to that respond-

fees totaling $446,977.32, and, sitting as a court of equity, it ordered petitioner to divest itself of the centers involved here, *Treadway Cos. v. Brunswick Corp.*, 389 F. Supp. 996 (NJ 1974). Petitioner appealed.[5]

The Court of Appeals, while endorsing the legal theories upon which respondents' claim was based, reversed the judgment and remanded the case for further proceedings. *NBO Industries Treadway Cos. v. Brunswick Corp., supra.* The court found that a properly instructed jury could have concluded that petitioner was a "giant" whose entry into a "market of pygmies" might lessen horizontal retail competition, because such a "giant"

> "has greater ease of entry into the market, can accomplish cost-savings by investing in new equipment, can resort to low or below cost sales to sustain itself against competition for a longer period, and can obtain more favorable credit terms." 523 F. 2d, at 268.

The court also found that there was sufficient evidence to permit a jury to conclude that but for petitioner's actions, the acquired centers would have gone out of business. *Id.*,

---

ent in accord with its minimum claim dating back to 1963, when the alleged § 2 violation began, rather than back to 1965, when the alleged § 7 violation began. The District Court thought that the jury might have been confused by the instruction to use the same methods for calculating damages under the two sections. *Ibid.*

[5] Petitioner's appeal and respondents' cross-appeal with respect to the amount of the attorneys' fee award initially were dismissed by the Court of Appeals for want of jurisdiction because the District Court had neither disposed of respondents' equitable claim nor certified the judgment entered on the legal claims pursuant to Fed. Rule Civ. Proc. 54 (b). *Treadway Cos. v. Brunswick Corp.*, 500 F. 2d 1400 (CA3 1974) (order reported); App. A1563–A1566 (*per curiam* opinion reprinted). The District Court then certified the previously entered judgment, and the parties reappealed. While the appeals were pending, the District Court granted equitable relief, and the appeal from that judgment was consolidated with the pending appeals.

at 273, 275–277. And the court held that if a jury were to make such findings, respondents would be entitled to damages for threefold the income they would have earned. After reviewing the instructions on these issues, however, the court decided that the jury had not been properly charged and that therefore a new trial was required. *Id.*, at 275–277.[6] It also decided that since "an essential predicate" for the District Court's grant of equitable relief was the jury verdict on the § 7 claim, the equitable decree should be vacated as well. *Id.*, at 277–278. And it concluded that in any event equitable relief "should be restricted to preventing those practices by which a deep pocket market entrant harms

---

[6] With respect to the instruction on the issue of liability, the court concluded that since petitioner's acquisitions "did not increase concentration," the District Court had erred by focusing on the size of the market shares acquired by petitioner rather than on "indicators of qualitative substantiality" such as the "relative financial strength of Brunswick, Treadway, and other competitors," or "any retail market advantage" enjoyed by petitioner because of its status as financier and manufacturer. *NBO Industries Treadway Cos.* v. *Brunswick Corp.*, 523 F. 2d, at 274–275 (CA3 1975). With respect to the instruction on damages, the Court of Appeals concluded that the District Court had failed to direct the jury to decide whether petitioner's actions were responsible for keeping the acquired centers in business before considering how much additional income respondents would have earned if the acquired centers had been closed. *Id.*, at 276–277.

The Court of Appeals also held, *id.*, at 275, that in instructing the jury on the statutory requirement that the acquired company be "engaged . . . in commerce," the District Court had not anticipated this Court's decision in *United States* v. *American Bldg. Maint. Industries*, 422 U. S. 271 (1975), which read the "in commerce" requirement more restrictively than had the leading decision of the Third Circuit, *Transamerica Corp.* v. *Board of Governors*, 206 F. 2d 163, cert. denied, 346 U. S. 901 (1953). Indeed, the court indicated that there might not be sufficient evidence in the record to satisfy the "in commerce" test. 523 F. 2d, at 271. The court concluded, however, that given the change in the law, it would be "unjust" to find the evidence insufficient and thereby deny plaintiffs an opportunity to meet the new test on retrial.

competition . . . . [D]ivestiture was simply inappropriate."
*Id.*, at 279.

Both sides petitioned this Court for writs of certiorari. Brunswick's petition challenged the theory the Court of Appeals had approved for awarding damages; the plaintiffs' petition challenged the Court of Appeals' conclusions with respect to the jury instructions and the appropriateness of a divestiture order.[7] We granted Brunswick's petition.[8] 424 U. S. 908 (1976).

## II

The issue for decision is a narrow one. Petitioner does not presently contest the Court of Appeals' conclusion that a properly instructed jury could have found the acquisitions unlawful. Nor does petitioner challenge the Court of Appeals' determination that the evidence would support a finding that had petitioner not acquired these centers, they would have gone out of business and respondents' income would have increased. Petitioner questions only whether antitrust damages are available where the sole injury alleged is that competitors were continued in business, thereby denying respondents an anticipated increase in market shares.[9]

---

[7] Both petitions also questioned the Court of Appeals' decision to require relitigation of the "in commerce" issue, see n. 6, *supra*. Brunswick maintained it was entitled to a directed verdict on this issue; plaintiffs argued that they had satisfied the new test and that therefore no new trial was required.

[8] The grant of certiorari excluded the question Brunswick sought to present concerning the sufficiency of the evidence that the acquired companies were engaged "in commerce," see nn. 6, 7, *supra*.

No action has been taken with respect to respondents' petition.

[9] Petitioner raises this issue directly through the first question presented, and indirectly through the second, which asks:

"Does not the 'failing company' principle require dismissal of a treble-damage action based on alleged violations of Section 7 of the Clayton Act where the plaintiffs' entire damage theory is based on the premise that the 'acquired' businesses would have failed and disappeared from the

To answer that question it is necessary to examine the anti-merger and treble-damages provisions of the Clayton Act. Section 7 of the Act proscribes mergers whose effect *"may be substantially to lessen competition, or to tend to* create a monopoly."* (Emphasis added.) It is, as we have observed many times, a prophylactic measure, intended "primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil . . . ." *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 597 (1957). See also *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 317–318 (1962); *United States* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 362–363 (1963); *United States* v. *Penn-Olin Chemical Co.,* 378 U. S. 158, 170–171 (1964); *United States* v. *Von's Grocery Co.,* 384 U. S. 270, 277 (1966); *FTC* v. *Procter & Gamble Co.,* 386 U. S. 568, 577–578 (1967); *Gulf Oil Corp.* v. *Copp Paving Co.,* 419 U. S. 186, 201 (1974).

Section 4, in contrast, is in essence a remedial provision. It provides treble damages to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." Of course, treble damages also play an important role in penalizing wrongdoers and deterring wrongdoing, as we also have frequently observed. *Perma Life Mufflers* v. *International Parts Corp.,* 392 U. S. 134, 139 (1968); *Fortner Enterprises* v. *United States Steel Corp.,* 394 U. S. 495, 502 (1969); *Zenith Radio Corp.* v. *Hazeltine Research,* 395 U. S. 100, 130 (1969); *Hawaii* v. *Standard Oil Co.,* 405 U. S. 251, 262 (1972). It nevertheless is true that the treble-damages provision, which makes awards available only to injured parties, and measures the awards by a

market had the defendant not kept them alive by making the challenged 'acquisitions?' " Pet. for Cert. 3.

In light of our holding, we have no occasion to consider the applicability of the failing-company defense to the conglomerate-like acquisitions involved here.

multiple of the injury actually proved, is designed primarily as a remedy.[10]

Intermeshing a statutory prohibition against acts that have a potential to cause certain harms with a damages action intended to remedy those harms is not without difficulty. Plainly, to recover damages respondents must prove more than that petitioner violated § 7, since such proof establishes only that injury may result. Respondents contend that the only additional element they need demonstrate is that they are in a worse position than they would have been had petitioner not committed those acts. The Court of Appeals agreed,

---

[10] Treble-damages antitrust actions were first authorized by § 7 of the Sherman Act, 26 Stat. 210 (1890). The discussions of this section on the floor of the Senate indicate that it was conceived of primarily as a remedy for "[t]he people of the United States as individuals," especially consumers. 21 Cong. Rec. 1767–1768 (1890) (remarks of Sen. George); see id., at 2612 (Sens. Teller and Reagan), 2615 (Sen. Coke), 3146–3149. Treble damages were provided in part for punitive purposes, id., at 3147 (Sen. George), but also to make the remedy meaningful by counterbalancing "the difficulty of maintaining a private suit against a combination such as is described" in the Act. Id., at 2456 (Sen. Sherman).

When Congress enacted the Clayton Act in 1914, it "extend[ed] the remedy under section 7 of the Sherman Act" to persons injured by virtue of any antitrust violation. H. R. Rep. No. 627, 63d Cong., 2d Sess., 14 (1914). The initial House debates concerning provisions related to private damages actions reveal that these actions were conceived primarily as "open[ing] the door of justice to every man, whenever he may be injured by those who violate the antitrust laws, and giv[ing] the injured party ample damages for the wrong suffered." 51 Cong. Rec. 9073 (1914) (remarks of Rep. Webb); see, e. g., id., at 9079 (Rep. Volstead), 9270 (Rep. Carlin), 9414–9417, 9466–9467, 9487–9495. The House debates following the conference committee report, however, indicate that the sponsors of the bill also saw treble-damages suits as an important means of enforcing the law. Id., at 16274–16275 (Rep. Webb), 16317–16319 (Rep. Floyd). In the Senate there was virtually no discussion of the enforcement value of private actions, even though the bill was attacked as lacking meaningful sanctions, e. g., id., at 15818–15821 (Sen. Reed), 16042–16046 (Sen. Norris).

holding compensable any loss "causally linked" to "the mere presence of the violator in the market." 523 F. 2d, at 272–273. Because this holding divorces antitrust recovery from the purposes of the antitrust laws without a clear statutory command to do so, we cannot agree with it.

Every merger of two existing entities into one, whether lawful or unlawful, has the potential for producing economic readjustments that adversely affect some persons. But Congress has not condemned mergers on that account; it has condemned them only when they may produce anticompetitive effects. Yet under the Court of Appeals' holding, once a merger is found to violate § 7, all dislocations caused by the merger are actionable, regardless of whether those dislocations have anything to do with the reason the merger was condemned. This holding would make § 4 recovery entirely fortuitous, and would authorize damages for losses which are of no concern to the antitrust laws.[11]

Both of these consequences are well illustrated by the facts of this case. If the acquisitions here were unlawful, it is because they brought a "deep pocket" parent into a market of "pygmies." Yet respondents' injury—the loss of income that would have accrued had the acquired centers gone bankrupt—bears no relationship to the size of either the acquiring company or its competitors. Respondents would have suffered the identical "loss"—but no compensable injury—had the acquired centers instead obtained refinancing or been purchased by "shallow pocket" parents, as the Court of Appeals itself acknowledged, 523 F. 2d, at 279.[12] Thus, respondents' injury was not of "the type that the statute was

---

[11] See Areeda, Antitrust Violations Without Damage Recoveries, 89 Harv. L. Rev. 1127, 1130–1136 (1976); Symposium, Private Enforcement of the Antimerger Laws, 31 Record of N. Y. C. B. A., 239, 260–261 (1976).

[12] Conversely, had petitioner acquired thriving centers—acquisitions at least as violative of § 7 as the instant acquisitions—respondents would not have lost any income that they otherwise would have received.

intended to forestall," *Wyandotte Co.* v. *United States,* 389 U. S. 191, 202 (1967).[13]

But the antitrust laws are not merely indifferent to the injury claimed here. At base, respondents complain that by acquiring the failing centers petitioner preserved competition, thereby depriving respondents of the benefits of increased concentration. The damages respondents obtained are designed to provide them with the profits they would have realized had competition been reduced. The antitrust laws, however, were enacted for "the protection of *competition,* not *competitors,*" *Brown Shoe Co.* v. *United States,* 370 U. S., at 320. It is inimical to the purposes of these laws to award damages for the type of injury claimed here.

Of course, Congress is free, if it desires, to mandate damages awards for all dislocations caused by unlawful mergers despite the peculiar consequences of so doing. But because of these consequences, "we should insist upon a clear expression of a congressional purpose," *Hawaii* v. *Standard Oil Co.,* 405 U. S., at 264, before attributing such an intent to Congress. We can find no such expression in either the language or the legislative history of § 4. To the contrary, it is far from clear that the loss of windfall profits that would have accrued had the acquired centers failed even constitutes "injury" within the meaning of § 4. And it is quite clear that if respondents were injured, it was not "by reason of anything forbidden in the antitrust laws": while respondents' loss occurred "by reason of" the unlawful acquisitions, it did not occur "by reason of" that which made the acquisitions unlawful.

---

[13] For instances in which plaintiffs unsuccessfully sought damages for injuries unrelated to the reason the merger was prohibited, see *Reibert* v. *Atlantic Richfield Co.,* 471 F. 2d 727 (CA10), cert. denied, 411 U. S. 938 (1973); *Peterson* v. *Borden Co.,* 50 F. 2d 644 (CA7 1931); *Kirihara* v. *Bendix Corp.,* 306 F. Supp. 72 (Haw. 1969); *Goldsmith* v. *St. Louis-San Francisco R. Co.,* 201 F. Supp. 867 (WDNC 1962).

We therefore hold that for plaintiffs to recover treble damages on account of § 7 violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause." *Zenith Radio Corp.* v. *Hazeltine Research,* 395 U. S., at 125.[14]

## III

We come, then, to the question of appropriate disposition of this case. At the very least, petitioner is entitled to a new trial, not only because of the instructional errors noted by the Court of Appeals that are not at issue here, see n. 6, *supra,* but also because the District Court's instruction

---

[14] See generally *GAF Corp.* v. *Circle Floor Co.,* 463 F. 2d 752 (CA2 1972), cert. dismissed, 413 U. S. 901 (1973); Comment, Section 7 of the Clayton Act: The Private Plaintiff's Remedies, 7 B. C. Ind. & Comm. L. Rev. 333 (1966); Comment, Treble Damage Actions for Violations of Section 7 of the Clayton Act, 38 U. Chi. L. Rev. 404 (1971).

This does not necessarily mean, as the Court of Appeals feared, 523 F. 2d, at 272, that § 4 plaintiffs must prove an actual lessening of competition in order to recover. The short-term effect of certain anticompetitive behavior—predatory below-cost pricing, for example—may be to stimulate price competition. But competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened. Of course, the case for relief will be strongest where competition has been diminished. See, *e. g., Calnetics Corp.* v. *Volkswagen of America, Inc.,* 532 F. 2d 674 (CA9 1976); *Metric Hosiery Co.* v. *Spartans Industries, Inc.,* 50 F. R. D. 50 (SDNY 1970); Klingsberg, Bull's Eyes and Carom Shots: Complications and Conflicts on Standing to Sue and Causation Under Section 4 of the Clayton Act, 16 Antitrust Bull. 351, 364 (1971).

as to the basis for damages was inconsistent with our holding as outlined above. Our review of the record, however, persuades us that a new trial on the damages claim is unwarranted. Respondents based their case solely on their novel damages theory which we have rejected. While they produced some conclusory testimony suggesting that in operating the acquired centers petitioner had abused its deep pocket by engaging in anticompetitive conduct,[15] they made no attempt to prove that they had lost any income as a result of such predation.[16] Rather, their entire proof of damages was based on their claim to profits that would have been earned had the acquired centers closed. Since respondents did not prove any cognizable damages and have not offered any justification for allowing respondents, after two trials and over 10 years of litigation, yet a third opportunity to do so, it follows that, petitioner is entitled, in accord with its motion made pursuant to Rule 50 (b), to judgment on the damages claim notwithstanding the verdict. *Neely* v. *Eby Constr. Co.,* 386 U. S. 317, 326–330 (1967); *United States* v. *Generes,* 405 U. S. 93, 106–107 (1972).

---

[15] Respondents' testimony concerned price reductions at three centers, App. A170, A420, A431; unjustified capital expenses at three centers, *id.,* at A503–A506, A829–A830; and extravagant "give-aways," *id.,* at A169–A170, A222–A223, A413–A414, A569. This testimony is rather unimpressive when viewed against both petitioner's contemporaneous business records which reveal that it did not lower prices when it took over the centers, Defendant's Exhibits D–32, D–33, D–36, D–38, and respondents' own exhibits, which demonstrate that petitioner made a profit at two centers, App. A1700, generated a positive cash flow at three others, *id.,* at A1717, A1720, and closed the two centers that were unsuccessful, *id.,* at A1725, A1733.

[16] One of respondents' witnesses did testify that he knew of one bowling league in Pueblo that had shifted from a respondent to petitioner after petitioner installed faster automatic pinsetters. *Id.,* at 508. Assuming, *arguendo,* that such installations were not cost justified and constituted a form of predation, respondents still made no attempt to quantify the loss.

Respondents' complaint also prayed for equitable relief, and the Court of Appeals held that if respondents established a § 7 violation, they might be entitled to an injunction against "those practices by which a deep pocket market entrant harms competition." 523 F. 2d, at 279. Because petitioner has not contested this holding, respondents remain free, on remand, to seek such a decree.

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*