A. D. M. CORP., Plaintiff,

v.

SIGMA INSTRUMENTS, INC., et al., Defendants.

CA 78–288–T.

United States District Court,
D. Massachusetts.

Jan. 4, 1980.

Angelo M. Torrisi, New York City, Martin, Morse, Wylie & Kaplan, Gordon A. Martin, Boston, Mass., for plaintiff.

Goodwin Procter & Hoar, Donald B. Gould, James E. McGuire, Boston, Mass., for Sigma Intruments, Inc.

Mintz, Levin, Cohn, Glovsky & Popeo, Michael Gardener, Joseph C. Tanski, Boston, Mass., for Thomson and Frost, Inc.

## OPINION

TAURO, District Judge.

In its substitute complaint, plaintiff (ADM) charges the defendants with a variety of misdeeds in connection with the acquisition of the plaintiff's assets by defendant Sigma Instruments, Inc. (Sigma).[1] At issue here is defendants' motion to dismiss.

### I.

ADM is a Massachusetts corporation. Prior to October 1974, it was engaged in the design, production, and sale of photo electric-motion controls and relay switching devices. At all relevant times, ADM was a member of the General Electronics, Inc. (General) corporate family. That family included two wholly owned subsidiaries: United Electronics Company of New Jersey (United, NJ) and United Electronics Company of Delaware (United, Del). ADM is a wholly owned subsidiary of United, Del.

In June 1973, United, NJ borrowed money from Factors and Note Buyers, Inc.,

---

1. Plaintiff's complaint alleges violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 7 of the Clayton Act, 15 U.S.C. § 18, (Counts I-IV) and of Chapter 93A of the Massachusetts General Laws (Counts V-VII).

(Factors), a New Jersey commercial lender. As partial security for that loan, United, Del pledged its ADM stock. The loan became in default as of October 1973. Later that month, Factors took over the pledged ADM stock.

In September 1974, Sigma sought to acquire ADM's assets. Its purpose was to establish a production capability in various markets for general purpose relays. ADM alleges that defendant Arthur J. Thomson, then President of ADM, conspired with Factors and Sigma to obtain the ADM stock for Sigma. In furtherance of that scheme, ADM asserts that on October 9, 1974, Thomson formed Frost, Inc., (Frost) with himself as President and sole shareholder. On October 21, 1974, Frost paid $218,000 to Factors in exchange for the ADM assets. Two months later, Sigma paid Frost $290,-000 for the assets plus $10,000 to Thomson in exchange for ADM trade secrets. As a result of these transactions, Thomson and his corporate vehicle, Frost, received $300,-000 while Sigma acquired the ADM assets and trade secrets.

The final twist in the corporate drama occurred in June 1975 when, as a result of a New Jersey Superior Court order, Factors' purchase of ADM stock was rolled back. Factors was ordered to return the ADM stock to United, Del, to pay $206,000 to ADM for the sale of the ADM assets, and to return other pledged assets to United, NJ. Sigma retained the ADM assets.

## II.

### THE FEDERAL ANTITRUST CLAIMS

Plaintiff's case rests on the alleged conspiracy entered into by Thomson, Sigma and Factors during September 1974. Plaintiff theorizes that these conspirators committed a number of business torts and unfair trade practices to effect Sigma's monopolistic aim of eliminating ADM as a competitor in various relay markets. That, says the plaintiff, is enough to establish a cause of action under § 4 of the Clayton Act, 15 U.S.C. § 15.

It is well settled that the Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954 (1945). Recently, the Supreme Court has stressed again that plaintiffs suing for damages under § 4 of the Clayton Act "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original). Thus, only those parties damaged by specific anti-competitive acts may recover under § 4 of the Clayton Act. *Engine Specialties, Inc. v. Bombardier, Inc.*, 605 F.2d 1, 14 (1st Cir. 1979).

In the present case, the only anticompetitive behavior alleged by ADM is the purchase of its assets by Sigma. ADM's elimination might affect other companies active in the relay switching field in that a "deep pocket" competitor, Sigma, has emerged on the scene. But, the challenge to those companies is of no antitrust consequence to ADM which, effectively, is now out of the marketplace.

ADM's complaints are not antitrust-based. Rather, they assert damage caused by unfair trade practices and breaches of fiduciary duty. These torts and the damages they may have produced are unrelated to any competition between ADM and the defendants. If, for example, Thomson and Frost had conspired to effect the same transactions with a company not in the relevant markets (and without a "deep pocket"), ADM would have suffered the same injury claimed here. But there would be no antitrust claim, since no anticompetitive effects would have resulted. Here, the nature and scope of defendants' business activity is irrelevant to ADM's theory of injury. Plaintiff's claims are essentially business torts dressed up in the guise of federal antitrust.

A comparable claim was rejected by the Court in *Brunswick, supra*. There, a bowling lane manufacturer foreclosed on a num-

ber of defaulting bowling centers and thereby entered the retail bowling market. Several other bowling centers sought recovery under Clayton Act § 4 charging that the manufacturer was thus monopolizing in violation of Clayton Act § 7. Specifically, the rival bowling centers argued that the manufacturer's "deep pocket" would enable it to drive smaller competitors out of business. They sought to establish damages by calculating the profits they would have realized had the defaulting bowling centers been acquired by them rather than the foreclosing defendant. *Id.* 429 U.S. at 481, 97 S.Ct. 690.

The Court held for the defendant. It relied on the lack of connection between the allegedly anticompetitive effects of the defendant's entry into retail bowling and the plaintiffs' claimed damages. Specifically, the Court noted that had the defaulting bowling centers obtained refinancing or been purchased by a small firm (e. g., one not posing the same competitive dangers as that of the "deep pocket" defendant), plaintiffs "would have suffered the identical 'loss'—but no compensable injury," *id.* at 487, 97 S.Ct. at 697. The plaintiffs had not shown that their injury reflected "the anticompetitive effect either of the violation [of the antitrust statutes] or of anticompetitive acts made possible by the violation." *Id.* at 489, 97 S.Ct. at 697.

The same issue arose in *Engine Specialties, supra.* There, ESI sued for damages under §§ 4 and 16 of the Clayton Act. Defendant Agrati-Garelli, a manufacturer of minibikes, had terminated ESI as Agrati's exclusive distributor and substituted defendant Bombardier. Bombardier had previously been both a manufacturer and a retailer of minibikes and had threatened Agrati with competition at both levels. To forestall that competition, Agrati and Bombardier agreed to a market division with Agrati as the manufacturer and Bombardier as the retailer and Agrati's exclusive distributor.

Bombardier claimed that ESI's injury was not related to the anticompetitive effects of the market division between Agrati and Bombardier and that ESI would have suffered the same injury had Agrati merely switched its distributorship to Sears. Such a switch, Bombardier argued, would not have involved an antitrust violation. The Court of Appeals rejected that argument and upheld the damages awarded to ESI. It found the *Brunswick* requirement satisfied in the connection between the market division and the specific actions taken by Bombardier and Agrati to reduce or eliminate ESI's effectiveness as a competitor. *Id.* at 13–15. The court reasoned that a simple switch to Sears would not have led to the kinds of actions taken by the defendants affecting ESI—such as abrupt cancellation of the exclusive distributorship in violation of the contract terms, deceptive discovery of trade data, and predatory underpricing. *Id.* at 14–15. These actions could only be explained by the added factor of the agreed market division between the defendants: "[t]he ineluctable result of the allocation of markets was that Agrati could no longer provide minicycles to ESI." *Id.* at·15.

Here, the elimination of ADM as a competitor was, in a sense, the "ineluctable result" of Sigma's purchase of ADM's assets. But, ADM's injury is not the "ineluctable result" of its demise as a competitor. It is not the *fact* of ADM's elimination that led to its injury. Rather, the injury resulted from the alleged conflict of interest and duplicity that permeated the transaction.

Nothing alleged here demonstrates a causal relationship between Sigma's acquisition of ADM's assets and the various instances of self-dealing and breach of fiduciary duty on which ADM rests its claim for damages. Perhaps recognizing that weakness, ADM advances another line of argument in reliance on *Albert Pick-Barth Co., Inc. v. Mitchell Woodbury Corp.,* 57 F.2d 96 (1st Cir.), *cert. denied,* 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932). *See also Atlantic Heel Co., Inc. v. Allied Heel Co., Inc.,* 284 F.2d 879 (1st Cir. 1960). These cases stand for the proposition that certain types of unfair trade practices, accompanied by an intent to hurt a competitor, may constitute

per se violations of § 1 of the Sherman Act. In *Pick-Barth* and *Atlantic Heel*, for example, allegations that the defendants raided the plaintiffs for key employees, disturbed the plaintiffs' customer relations, and misappropriated trade secrets were held sufficient to make out a § 1 case.

But, ADM's reliance on the *Pick-Barth* line is misplaced. First, several courts have recently rejected outright the *Pick-Barth* per se rule. *See, e. g., Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d 83, 88 (5th Cir.), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1978) (citing cases). Second, the First Circuit itself has reexamined *Pick-Barth* and concluded ·that "[i]nsofar as *Pick-Barth* and *Atlantic Heel* may be said to stand for the broad proposition that unfair competitive practices accompanied by an intent to hurt a competitor constitute per se violations of the antitrust laws, we do not now accept their teaching." *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 561 (1st Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). The result is that in this Circuit the *Pick-Barth* allegations are to be tested by the rule of reason. *Engine Specialties, supra*, at 16.

■ Under such a test, ADM still faces its failure to demonstrate a causal link between the possible monopolistic effects of Sigma's acquisition and the unfair practices associated with the purchase. Moreover, *Whitten* stressed that the "focus" of *Pick-Barth* had been "on crippling the organization of a competitor." *Whitten, supra*, at 562. The essence of the employee defections and trade sabotage found in the *Pick-Barth* cases was the raider's attempt to reduce the effectiveness of ongoing competition. Here, ADM's effectiveness as a competitor was not crippled, but eliminated altogether. ADM, therefore, has no standing to assert the monopolizing effects of Sigma's acquisition in a market in which, as of the date of the acquisition, ADM no longer competed. Only ongoing competitors may now raise that claim.

As for the allegedly tortious conduct surrounding the asset transfer, ADM may well have a valid claim. But that type of claim is reserved to state unfair practices and corporate law. ADM's complaint would have this court blur the line separating federal antitrust law from those other bodies of law, largely state-created, that govern the management of corporate and commercial affairs. But, the very reason many courts have rejected the *Pick-Barth* line is that its rationale tended to merge these two distinct bodies of law. *See, e. g., Northwest Power, supra*, at 87–90. If Sigma has violated the antitrust laws, then it should answer to those injured thereby—its ongoing competitors. If ADM has been injured by self-dealing and breach of fiduciary duty, then it should seek its remedy under those laws that address such activities. These are distinct theories whose independence must be recognized and respected.

For failure to state an *antitrust* claim, plaintiff's federal claims must be dismissed.

### III.

### THE STATE CHAPTER 93A CLAIMS

■ Plaintiff's pendent claims under Chapter 93A of the Massachusetts General Laws (Counts V–VII) should be dismissed under the guidance of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). There, the Supreme Court counselled that, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.* at 726, 86 S.Ct. at 1139. Moreover, ADM has brought similar Chapter 93A claims in another action pending in this court, hence no prejudice is likely to result from dismissal here. Counts V–VII are also dismissed, therefore.

An order will issue.