In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1137

Sokaogon Chippewa Community, Mole Lake Band
of Lake Superior Chippewa; Lac Courte Oreilles
Band of Lake Superior Chippewa Indians
of Wisconsin, et al.,

Plaintiffs-Appellees,

v.

Bruce E. Babbitt, Secretary, United States
Department of the Interior, Michael J. Anderson,
Deputy Assistant Secretary, United States
Department of the Interior, et al.,

Defendants-Appellees,



Appeal of St. Croix Chippewa Indians of Wisconsin,
Proposed Intervenor-Appellant.


Appeal from the United States District Court
for the Western District of Wisconsin.
No. 95-C-0659-C--Barbara B. Crabb, Judge.

Argued April 11, 2000--Decided June 6, 2000



  Before Manion, Diane P. Wood, and Evans, Circuit
Judges.

  Diane P. Wood, Circuit Judge.  The lucky winners
at blackjack, baccarat, twenty-one, and the slot
machines are not the only ones who see the
prospect of great wealth flowing from casinos.
Even more so (and even more reliably), wealth
comes to those who own and operate gambling
establishments. Casino gambling has become a
major enterprise for many Native American groups,
as Congress has paved the way for their entry
into that business. This case pits one group of
Indian tribes who hope to open a new gambling
facility against another tribe that currently
runs another gambling facility nearby. The narrow
question before us is whether the district court
erred when it refused to permit the St. Croix
Chippewa Indians of Wisconsin ("the St. Croix")
to intervene, either of right or by permission,
in litigation between the Sokaogon Chippewa
Community Mole Lake Band of Lake Superior
Chippewa ("the Sokaogon"), the Lac Courte

Oreilles Band of Lake Superior Chippewa Indians ("the LCO"), and the Red Cliff Band of Lake Superior Chippewa Indians ("the Red Cliff"), and the U.S. Department of the Interior. We conclude that it did not and we therefore affirm the district court's decision.

I

The story began with the 1994 decision of the Sokaogon, the Red Cliff, and the LCO to form a partnership under the name "Four Feathers," for the purpose of acquiring a struggling greyhound racing track outside of Hudson, Wisconsin, and converting the track into a casino gaming facility. (The fourth "feather" was Fred Havenick, a private businessman with a financial interest in the greyhound track.) Hoping to take the property in trust, the Four Feathers partnership submitted a joint application to the Department of Interior under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. sec.sec. 2701 et seq. The St. Croix, which has its reservation in northwest Wisconsin, opposed and continues to oppose the proposed casino gaming facility. It predicts that the Four Feathers casino will have a detrimental impact on the gaming revenues it derives from the two casino gaming facilities it currently operates (one in Turtle Lake and the other in Danbury, Wisconsin), and that the loss of revenue will in turn harm the quality of life on its reservation.

Under Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. sec. 465, the Secretary of the Interior has broad authority to acquire property in trust for Indian tribes./1 Using a type of double-negative, IGRA restricts this broad grant of authority by prohibiting the acquisition of trust land for gaming purposes, but then sec. 2719(b)(1)(A) of the Act establishes an exception to the exception. In order to be able to acquire land in trust for gaming purposes, tribes must show that "[1] a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and [2] [it] would not be detrimental to the surrounding community." 25 U.S.C. sec. 2719(b)(1)(A). To determine whether applicant tribes have satisfied this test, the IGRA requires the Secretary to consult with "the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes." Id. Even if the Secretary decides to grant the application, there is still one more step in the process. The Governor of the state in which the proposed gaming activity will be conducted must also concur in the Secretary's determination, id., and only then can the facility open.

On March 4, 1994, Four Feathers filed an application with the Department of the Interior's Minneapolis Area Office asking the Department to take into trust the Hudson greyhound racing track, so that Four Feathers could convert it into a casino gaming facility. Under Department of Interior internal procedures, the Department's Area Office is responsible for making the initial determination of whether an applicant tribe has met the requirements of sec. 2719(b). See Checklist for Acquisitions for Gaming Purposes. The Minneapolis Area Office accordingly consulted with municipalities, citizens, and others in the communities surrounding the site of the proposed casino gaming facility. The St. Croix urged the Area Office to recommend denial of the application because of the negative effect the proposed casino would have on the revenues of the St. Croix's existing casinos. In a report dated November 14, 1994, the Minneapolis Office advised the Bureau of Indian Affairs ("BIA") that in its view the applicant tribes (that is, the Four Feathers) had satisfied the requirements of IGRA sec. 2719 and that their application should be approved.

At that point, at least in hindsight, things took a significant detour. Instead of ruling on the basis of the record that had been compiled, BIA officials agreed in early 1995 to meet with federal elected officials from Minnesota and officials from several Indian tribes, including the St. Croix. These officials expressed their concern about the impact of the proposed new casino on revenues earned by existing Indian casinos operating in the Hudson, Wisconsin area. As a result of the meeting, BIA agreed to extend the comment period for the Four Feathers application until April 30, 1995. The St. Croix and several others interested in the proposed casino project submitted comments by the new deadline.

On July 14, 1995, Interior denied the Four Feathers application. The letter informing Four Feathers of the decision indicated that it had failed to demonstrate that the new casino would not have a detrimental impact on the surrounding community. Outraged by Interior's apparent about-face in response to ex parte political pressure, Four Feathers filed this suit under the Administrative Procedure Act, 5 U.S.C. sec.sec. 701 et seq., on September 15, 1995. Four Feathers's complaint alleged that Interior's denial of its application was arbitrary and capricious and violated applicable law, regulations, and internal policies and procedures, and it asked that the decision be vacated and the application remanded to Interior

for reconsideration. In time, these allegations of impropriety created a political firestorm that included Congressional hearings and the appointment of an Independent Counsel to investigate alleged misdeeds of White House and Department of the Interior officials. Once the Independent Counsel was appointed, the district court stayed the proceedings until the completion of the investigation.

There matters stood in the litigation until March 12, 1999, when the Department filed with the court a letter it had received from the Independent Counsel's Office stating that the Office supported mediation or settlement talks to resolve the civil suit. The parties took up the suggestion, and in early 1999, they selected a mediator. At that point, the existence of the settlement discussions became a matter of record; thereafter, newspaper articles about the progress of the case appeared on occasion. Just before the negotiations drew to a close, the St. Croix filed on November 26, 1999, an emergency motion to intervene in the action as a party defendant. Five days later, with the motion still pending, the parties filed with the district court an executed settlement agreement with a stipulation and proposed order of dismissal.

In the proposed Settlement Agreement, Interior agrees to withdraw its July 14, 1995, decision and to pick up where it had left off with its administrative review of the application. The Settlement Agreement sets out certain procedures that are to be followed during the renewed administrative review, including the following: The determination on the issue of detriment to the surrounding community under 25 U.S.C. sec. 2719(b) will be based upon facts set forth in the administrative record as it existed on July 14, 1995, as supplemented only by: (1) any additional information submitted as a part of consultations between the plaintiff Tribes and Interior as provided for herein; and (2) the supplemental documentation submitted in accordance with the provisions of paragraph 10 of this Settlement Agreement.

* * *

The mere fact of competition by the proposed casino with casinos of other Tribes shall not be determinative in Interior's decisionmaking.

The district court denied the motion on December 6, and, in the same order, terminated the litigation by executing a Stipulation of Dismissal. The court then denied St. Croix's motion for reconsideration on January 3, 2000.

II

Although in a broader sense this has the look and feel of an interlocutory appeal, it is not from the point of view of the putative intervenor, the St. Croix. As to it, the district court's ruling rejecting its effort to intervene was a final judgment, and its appeal is properly before us under 28 U.S.C. sec. 1291. See Nissei Sangyo America, Ltd. v. United States, 31 F.3d 435, 438 (7th Cir. 1994). Because Interior is now reconsidering the Four Feathers application, some might wonder why the St. Croix suit is not moot. The reason it is not, in our opinion, is because Interior is reconsidering the application under the procedures it agreed to follow in the Settlement Agreement. It is precisely that agreement and those procedures that are the target of the St. Croix attack; had Interior begun a fresh proceeding with respect to this license, the St. Croix would have been satisfied and the case would have ended. We must therefore consider the merits of the two theories under which the St. Croix sought to become part of the Four Feathers litigation.

A.   Intervention as of right

The St. Croix first claim that it was entitled to intervene of right, under Fed. R. Civ. P. 24(a). Insofar as this assertion rests on the nature of the interest the tribe asserts in the litigation, our review is de novo. People Who Care v. Rockford Bd. of Educ., 68 F.3d 172, 175 (7th Cir. 1995). Even applications under Rule 24(a) must, however, be timely, and we review a district court's decision that a motion to intervene was untimely only for abuse of discretion. Id.

Apart from the timeliness requirement, to which we turn later, Rule 24 establishes three requirements for someone seeking to intervene of right: (1) the applicant must claim an interest relating to the property or transaction which is the subject of the action, (2) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, and (3) existing parties must not be adequate representatives of the applicant's interest. See Fed. R. Civ. P. 24(a); 7C Wright, Miller & Kane, sec. 1908 (2d ed. 1986). In addition, at some fundamental level the proposed intervenor must have a stake in the litigation. Some disagreement remains among the circuits about how Article III standing rules intersect with the requirements for Rule 24 intervention. Compare, e.g., Ruiz v. Estelle, 161 F.3d 814, 830 (5th Cir. 1998)

(holding Article III standing not required for intervention), cert. denied 526 U.S. 1158 (1999), with Mausolf v. Babbitt, 85 F.3d 1295, 1300 (8th Cir. 1996) (holding Article III standing required for intervention); see also Rio Grande Pipeline Co. v. FERC, 178 F.3d 533, 538 (D.C. Cir. 1999) (describing circuit split and citing cases). This remains a question that the Supreme Court has not resolved. See Diamond v. Charles, 476 U.S. 54, 68-69 (1986); see generally 7C Wright, Miller & Kane, sec. 1908 (1999 supp.). From a pragmatic standpoint, this court has observed that "[a]ny interest of such magnitude [as to support Rule 24(a) intervention of right] is sufficient to satisfy the Article III standing requirement as well." Transamerica Ins. Co. v. South, 125 F.3d 392, 396 n.4 (7th Cir. 1997). But see United States v. 36.96 Acres of Land, 754 F.2d 855, 859 (7th Cir. 1985) (stating, before the Supreme Court tightened up the requirements for Article III standing in  Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), that intervention as of right requires an interest greater than that required for Article III standing). Because it is enough here to decide whether the St. Croix has satisfied the requirements of the rule, we do not explore further what the outer boundaries of standing to intervene might be.

   Intervention of right will not be allowed unless all requirements of the Rule are met. Wade v. Goldschmidt, 673 F.2d 182, 185 n.4 (7th Cir. 1982). In the lay sense of the term there can be little doubt that the St. Croix tribe is "interested" in the outcome of the Department's consideration of the Four Feathers application. Approval of the application will introduce a competitor in the greater Twin Cities casino gambling market, potentially leading to a decrease in the profits of the St. Croix's casinos. Denial of the application will leave the St. Croix's casinos free of competition (at least until another competitor decides to enter the market). But not all interests give rise to a right to sue, and the question here is whether the St. Croix has a legally protectible interest in fending off this unwelcome competition. If it does have such an interest, then for purposes of the second criterion we can assume that its interest will be impeded as a practical matter. Furthermore, we can assume here that none of the present parties to the litigation is an adequate representative for the St. Croix's interest (even though the government points out that in a broader sense it represents the long-term interests of all Native American groups). The petition to intervene of right thus turns on the first of these criteria: whether the St. Croix has successfully alleged an interest in the transaction that is the subject of the pending

lawsuit.

The "subject of the pending lawsuit," however, is not the merit of the Four Feathers application. From its inception, this lawsuit has focused instead on the procedures the Department used in making its 1995 determination. Like most APA cases, it involves a claim that the Department did not follow the prescribed decisionmaking procedures in arriving at its final decision. Indeed, in areas like this one, where the agency is granted broad discretionary authority, see 25 U.S.C. sec. 465 (authorizing Secretary to acquire lands "in his discretion"); 25 C.F.R. sec. 151.3(a) (providing Secretary "may" acquire land), practically the only cognizable complaint can be one directed to the question whether the agency followed the procedural constraints on the exercise of that discretion, as prescribed by statute and regulation. However hard it may be for the St. Croix to show that it has an interest in the ultimate outcome of the application process, here it faces the even tougher job of showing that it has a right to complain about the procedures the agency is using.

The Four Feathers complaint asked for two alternative remedies: either the grant of its application or the vacation of the 1995 denial and remand to the Department for further consideration. The district court correctly recognized that it could not compel the Secretary to grant or deny the application, given the discretionary nature of the decision. The most the court could do was (in keeping with Four Feathers's second request for relief) to evaluate the legality of the decisionmaking procedures used and, if they deviated from those prescribed by statute, declare the decision arbitrary and capricious and send the issue back to the Secretary for reconsideration under the appropriate procedures.

The St. Croix is asserting only an indirect interest in the outcome of this suit. If the procedures Interior followed in 1995 were proper, or if a different set of procedures had resulted from the settlement, then perhaps it might be able to defeat or to delay significantly the Four Feathers casino. At the end of the day, however, it recognizes that its interest in the new casino lies behind all the procedural maneuvering. With that in mind, it argues that three different interests support its right to intervene.

First, the St. Croix contends that if the Four Feathers application is granted, its own casino operations will become less profitable. That interest, however, does not resemble any that the

law normally protects. It is reminiscent instead of the unsuccessful claim Pueblo Bowl-O-Mat made in an antitrust challenge to Brunswick Corporation's acquisition of a competing bowling alley. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977). Pueblo reasoned that it was injured because the existence of competition would lead to lower prices. The Court did not take issue with that basic economic proposition, but it did dismiss Pueblo's claim on the ground that it had failed to allege the kind of injury for which the antitrust laws provide redress. Id. at 487-89. Although the IGRA requires the Secretary to consider the economic impact of proposed gaming facilities on the surrounding communities, it is hard to find anything in that provision that suggests an affirmative right for nearby tribes to be free from economic competition.

We need not resolve the question whether this interest is protectible, however, because there is a deeper flaw with the St. Croix's argument. As the Secretary points out in his brief, any detrimental impact from the proposed Four Feathers casino on the St. Croix reservation's economy is pure speculation at this point. The renewed administrative process required by the Settlement Agreement has barely had time to begin, and it is anyone's guess what the Secretary's final decision will be. Moreover, even if the Secretary approves the application, the casino cannot be built until the Governor of Wisconsin independently gives his approval. See 25 U.S.C. sec. 2719(b) (1)(A). Four Feathers must then succeed in financing and building the casino as well as gaining proper permits and licenses. Finally, the Four Feathers casino must be competitive. The St. Croix asks us to assume that if and when the Four Feathers casino is built it will necessarily destroy the St. Croix's gaming business. But as all businesspeople are acutely aware, in a competitive market, success is never sure. Maybe the Four Feathers casino will dominate, or maybe it will be a flop. Perhaps people will like the geographical advantage of the Four Feathers casino, which would be an easy drive from the Twin Cities, but for some a more bucolic getaway may be preferable. It is far too early to tell. Even if the St. Croix had some interest in the location of its competitors (rather like the interests asserted in various automobile dealer location statutes, see, e.g., Conn. Gen. Stat. sec. 42-133dd; 10 Me. Rev. Stat. Ann. sec. 1174-A), any effect on that interest from the Four Feathers project is too speculative to support intervention in this suit.

Second, the St. Croix asserts a generalized interest in the legality of the procedures used

by the Department to conduct its review. That is, the St. Croix contends that the review procedures laid out in the Settlement Agreement are unlawful, because they do not require the Department to perform the environmental assessments required under the National Environmental Policy Act ("NEPA"), 42 U.S.C. sec. 4321 et seq. In asserting this interest, the tribe claims the common interest of all citizens in ensuring that their government agencies follow the law. As countless cases have held, however, such a generalized interest is insufficient to support standing, let alone intervention. If it did, the federal courts would be required to allow anyone with an interest--however broad or universal--to intervene in any lawsuit in which the government is a party. To claim such an interest, the St. Croix must demonstrate (or at least claim) that it specifically would be adversely affected in some way, shape, or form, by the Department's alleged failure to follow applicable environmental statutes. This is not an impossible task. For example, if the failure to go through environmental procedures would have a detrimental impact on the St. Croix's water supply, the tribe would have a sufficiently specific interest for it to be cognizable. See Hill v. Boy, 144 F.3d 1446, 1449-50 (11th Cir. 1998); Dubois v. United States Department of Agriculture, 102 F.3d 1273, 1282-83 (1st Cir. 1996). But the St. Croix has alleged no such particularized interest. More importantly, the St. Croix does not argue that the Department's decision-making process in 1995 ignored applicable environmental regulations or failed to take the proposed casino's environmental impact into account. Instead, the tribe challenges only the legality of the procedures adopted by the parties in the Settlement Agreement, ignoring the fact that the Agreement specifically preserves its right to participate in the new NEPA process, at which point the tribe will be able to call to the Department's attention any current environmental issues or eventually to challenge any failure to follow the statute.

Last, the St. Croix alleges that the Settlement Agreement violates the consultation procedures laid out in the IGRA. The St. Croix contends that, by agreeing to turn the clock back to 1995 and base the decision to grant or deny the application entirely on the record as it existed at that time, the Settlement Agreement violates the tribe's right to provide comments on the casino project. The interest the St. Croix asserts is not encompassed in this lawsuit, however, because it does not contend that it was unlawfully blocked from providing comments in 1995. Rather, its complaint is purely forward-looking.

The St. Croix wants to intervene because it does not like the Settlement Agreement. The tribe believes that the terms of the Settlement Agreement violate statutes and regulations and unlawfully cut it out of the reconsideration of the Four Feathers application. The St. Croix, however, cannot use alleged legal problems with the Settlement Agreement to bootstrap itself into this litigation. That the St. Croix waited until settlement was imminent strongly suggests that the tribe was not interested in intervening in the litigation but in blocking a settlement between the parties--or, at a minimum, this settlement. If the St. Croix wanted to participate in the litigation, it should have moved to intervene when the suit was filed, or shortly thereafter. Likewise, if the St. Croix was concerned about settlement negotiations not taking its interests into account, it should have moved to intervene at such a time when it would have been able to participate in them. As it now stands, intervention by the St. Croix serves no conceivable purpose other than to block a settlement agreement that it does not like.

The St. Croix's final argument is that if we do not allow it to intervene in this litigation, it will be forever barred from challenging the Settlement Agreement. The St. Croix contends that the district court's approval of the Settlement Agreement is equivalent to a judicial determination that the terms of the Settlement Agreement are lawful-- that they comply with all applicable statutes and regulations. The district court's approval of the Settlement Agreement, however, is only binding between the parties to it. If either party does not live up to its end of the bargain, the other can ask the court to enforce the Agreement's terms. Others--like the St. Croix--who are not parties to the Settlement Agreement are not bound by its terms and are free to challenge any administrative decisions that emerge from the process. In essence, the St. Croix believes that the Department and Four Feathers have managed to resolve their dispute by contracting around the rights and interests of the St. Croix. This may or may not be true. If the Settlement Agreement is unlawful, as the St. Croix claims it is, it can bring a suit under the APA challenging as arbitrary and capricious the Secretary's ultimate decision (assuming, of course, it is then able to demonstrate the necessary adverse interest).

B.  Permissive intervention

Permissive intervention is allowed under Rule 24(b), once again upon timely application, "when an applicant's claim or defense and the main action have a question of law or fact in common."

Permissive intervention under Rule 24(b) is wholly discretionary and will be reversed only for abuse of discretion. Keith v. Daley, 764 F.2d 1265, 1272 (7th Cir. 1985). The district court denied St. Croix's motion to intervene under Rule 24(b) for a reason that applied with equal force to the motion under Rule 24(a); in each instance, the court found the motion untimely.

"The purpose of the [timeliness] requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal. As soon as a prospective intervenor knows or has reason to know that his interests might be adversely affected by the outcome of the litigation he must move promptly to intervene." United States v. South Bend Community Sch. Corp., 710 F.2d 394, 396 (7th Cir. 1983), quoted in United States v. City of Chicago, 870 F.2d 1256, 1263 (7th Cir. 1989). We consider the following factors to determine whether a motion is timely: (1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; (4) any other unusual circumstances. Ragsdale v. Turnock, 941 F.2d 501, 504 (7th Cir. 1991), citing South v. Rowe, 759 F.2d 610, 612 (7th Cir. 1985).

In the district court and here on appeal, the St. Croix argues that its motion was timely-- despite being filed five years after the initial complaint--because it could not have expected the outcome of the Settlement Agreement: first, that the denial of the application would be vacated, and second, that any settlement agreement would be unlawful. That is, the St. Croix asserts that it did not know its interests could be impaired by the litigation until after it received the Settlement Agreement.

The district court was well within the bounds of reason to find these arguments unpersuasive. From the moment Four Feathers filed its initial complaint, the St. Croix knew that there were only two possible outcomes of the litigation (and any settlement talks): either Four Feathers would cease trying to convince Interior to reconsider its decision or Interior would agree to reconsider its decision. The district court did no more than rely on the obvious when it found that the St. Croix had ample notice (five years) that settlement was possible and ample opportunity to request permission to intervene before a settlement was reached. The St. Croix's case is therefore nothing like the one faced by this court in City of Chicago, supra, where the white female police officers who wanted to intervene could not have anticipated that the new procedures would discriminate against them. See

870 F.2d at 1263. The St. Croix has known all along that its interests are directly pitted against those of Four Feathers. If the St. Croix wanted a voice in the litigation, it should have asked the district court to allow it to intervene much sooner. Had the St. Croix been a party all along, of course, it would have had a seat at the settlement table.

Relatedly, the district court found that Interior and Four Feathers would be prejudiced by St. Croix's late motion to intervene, because the parties had spent substantial time (nearly six months), effort, and money in settlement negotiations. To allow a tardy intervenor to block the settlement agreement after all that effort would result in the parties' combined efforts being wasted completely. The St. Croix does not contest that the parties' interests would not be prejudiced by intervention at this late date. Instead, the St. Croix focuses exclusively on how the denial of its motion to intervene would prejudice its own interests. This is not, however, a one-sided equation, and the district court would have been wrong to treat it as such. Instead, the court correctly weighed the interests on both sides and reasonably concluded that the equities favored the settling parties. On this point as well, the fact that the St. Croix will have an opportunity to challenge any eventual decision after it is made also weighs against a finding of prejudice.

C. Sanctions

Finally, Four Feathers has moved that sanctions be imposed against the St. Croix for its costs and attorneys fees incurred in conjunction with responding to the St. Croix's motion for a stay pending appeal. Although we have ruled against the St. Croix in this opinion, this is not an automatic warrant for sanctions. (It does mean, however, that costs on appeal will be taxed against the St. Croix. See Fed. R. App. P. 39(a)(2).) We decline to find that the appeal was frivolous or in bad faith, see Jansen v. Aaron Process Equip. Co., Inc., 207 F.3d 1001, 1005 (7th Cir. 2000); Perry v. Pogemiller, 16 F.3d 138, 139-40 (7th Cir. 1994), and we therefore deny the motion for sanctions.

The judgment of the district court is AFFIRMED.

/1 Section 465 provides:

The Secretary of the Interior is hereby authorized, in his discretion, to acquire,

through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

25 U.S.C. sec. 465.

The implementing regulations provide that the Secretary may acquire land for a tribe in trust status:

(1) when the property is located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within a tribal consolidation area; or, (2) when the tribe already owns an interest in the land or, (3) when the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing.

25 C.F.R. sec. 151.3(a), authorized by 25 U.S.C. sec. 465.