Aaron J. **FURMAN**, Martin J. Joel, Jr., Alvin Katz, Francis P. Maglio, Harvey Sheid, Everard M.C. Stamm and Robert C. Stamm, Plaintiffs,

v.

John **CIRRITO**, Harold S. Coleman, John A. Miller, Francis G. Rea, Peter M. Toczek and A.J. Yorke, Defendants.

No. 82 Civ. 4428 (IBC).

United States District Court, S.D. New York.

Jan. 6, 1984.

Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for plaintiffs; Alan Levine, Barry Levenfeld, Melanie Liebman, Joann R. Blasberg, Seymour Shainswit, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants; Max Gitter, Martin Flumenbaum, William P. Farley, New York City, of counsel.

OPINION

IRVING BEN COOPER, District Judge.

Defendants-movants seek an order pursuant to Fed.R.Civ.P. 12(b)(1) and (6) dis-

missing the complaint; or, in the alternative, compelling arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* For reasons set forth below, the motion to dismiss is granted on the ground hereinafter indicated.

The gravamen of the factual allegations contained in the complaint arise from the sale of Bruns, Nordeman, Rea & Co. ("Bruns") to Bache, Halsey, Stuart, Shields, Inc. ("Bache"). Plaintiffs,[1] the disgruntled, former Bruns' general partners, maintain that defendants, the former managing directors and executive committee for Bruns,[2] sold out to Bache on terms which were more favorable to defendants than plaintiffs.

Bruns, a limited partnership formed under the laws of the State of New York, carried on a general brokerage and commission business which included the buying and selling of stocks, bonds and other securities.[3] The infrastructure of Bruns was such that the managing directors were charged with the responsibility of selecting members of the executive committee; removing members of the executive committee, for or without cause; conferring voting rights relating to partnership business on such members of the executive committee as they saw fit; and most importantly, selling all or substantially all the assets of Bruns on such terms and conditions as they, in their exclusive discretion, approved.[1] The executive committee formulated Bruns' management policies and ran Bruns' business from day-to-day.[5]

Plaintiffs aver that in or about May or June 1981, defendant Rea commenced negotiations with Bache, a large brokerage firm, for the purchase of substantially all of Bruns' assets.[6] Shortly thereafter, Rea disclosed to several other members of the executive committee his intention to sell to Bache; and formed a negotiating committee comprised of defendants Miller, Toczek and himself to work out the details of the contemplated transfer.[7] By June 30, 1981 Bache and Bruns' negotiating committee had reached an agreement as to the basic terms of the transfer. Significantly, one of the essential terms of the purchase was that all partners at Bruns, including the limited partners, sign the purchase agreement—a fact, plaintiffs allege, they were never apprised of until it was too late.[8] Plaintiffs maintain that had they known their failure to sign the purchase agreement would have effectively blocked the deal, they never would have signed it.

On July 2, 1981, Bache and Bruns entered into a letter of intent describing the basic terms of the purchase.[9] Four days later, on July 6, 1981, the managing partners called a meeting of the entire partnership to apprise the remaining partners of the purchase.[10] Plaintiffs maintain that the clear tenor of the presentation was as *a fait accompli.* Indeed, several of defendants unequivocally stated that, "the deal was final and unchangeable."[11] Additionally, plaintiffs maintain that defendant Rea spoke to several of plaintiffs at or immediately after the partnership meeting to describe their respective terms of employment at Bache. Here, too, plaintiffs aver that it was made clear that the terms of

1.  Plaintiffs include: Aaron J. Furman, Alvin Katz, Francis P. Maglio, Everard Stamm, Robert C. Stamm and Harvey Shield and Martin Joel. Complaint, dated July 7, 1982, (hereinafter "Complaint") par. 4.

2.  Defendants Harold S. Coleman and Francis G. Rea were the managing directors for Bruns. Defendants John Cirrito, John A. Miller, Peter M. Toczek and A.J. Yorke, formed Bruns' executive committee. *Id.* at par. 6.

3.  *Id.* at par. 5.

4.  *Id.* at par. 6.

5.  *Id.* at par. 7.

6.  *Id.* at pars. 8–9.

7.  *Id.* at par. 11.

8.  *Id.* at pars. 12, 27.

9.  *Id.* at par. 16.

10.  *Id.* at pars. 20–22.

11.  *Id.* at par. 21.

employment—the unfairness of which was unknown to plaintiffs at that time—could not be altered.[12]

The very next day, a congratulatory cocktail party was held at the Waldorf Astoria Hotel for the partners and principals of both companies—a ploy, plaintiffs maintain in hindsight, to further convey the fraudulent notion of finality.[13] Additionally, news articles were published in the *Wall Street Journal* and the *New York Times* announcing the agreement between Bache and Bruns.[14]

It was not until July 23, 1981 that another partnership meeting was called to further discuss the then impending transfer.[15] It was at this meeting that plaintiffs allege they learned for the first time that their signatures were required on the contract as well as the first time they actually saw a copy of the purchase agreement.[16] Plaintiffs maintain that the notification to them, on July 23rd, that all their signatures were required effectively operated as no notice at all. By that time, Bruns' key personnel had heard the news and had already made alternative employment arrangements. Simply put, Bruns could not go on without them.[17]

In addition to a discussion of the signature requirements, plaintiffs steadfastly denied the soundness of the accepted purchase price: $3,500,000 over the book value plus additional sums depending upon future performance.[18] Apparently, on July 13, 1981, another brokerage house, Gruntal & Co., had offered Bruns a higher price.[19] Finally, plaintiffs took great exception to the employment and consultation agreements certain defendants had made with Bache.[20]

Notwithstanding all of the foregoing and based on the representations made by the executive committee, plaintiffs signed the purchase agreement on July 27, 1981.[21] Once the purchase agreement was signed, plaintiffs allege that defendants Rea and Coleman made certain illicit payments to several defendants for the purposes of inducing their consent to the transfer to Bache as well as their earlier agreement not to disclose the critical need for plaintiffs' signatures.[22]

＊　　　＊　　　＊　　　＊　　　＊　　　＊

Plaintiffs commenced this otherwise garden variety business fraud action in federal court on the basis of an alleged violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Plaintiffs have also pleaded, as pendent state law claims, fraud and breach of fiduciary duty. The threshold question then, as raised by defendants' motion to dismiss, is whether or not plaintiffs have sufficiently pleaded a claim for relief under

---

12. *Id.* at par. 22. Immediately after the July 6th meeting, the managing directors caused telegrams to be sent to all Bruns' limited partners advising them of the sale. *Id.*

13. *Id.* at par. 22(b).

14. *Id.*

15. *Id.* at pars. 25 and 27.

16. *Id.*

17. *Id.* at par. 28.

18. *Id.*

19. *Id.* at par. 24. The exact offer by Gruntal & Co. is not revealed in the Complaint.

20. *Id.* at pars. 17 and 25. Defendant Rea was to be paid $75,000 a year for twelve (12) years and upon his death payments were to be made to his spouse. Defendant Toczek was to receive a one-time payment of $100,000 for consultation on the deal. Defendant Miller was to receive $125,000 per year, a guarantee of a Senior Vice-President position at Bache and a "promise" by Bache to use its best efforts to elect him to the board of directors. *Id.* The Complaint is contradictory on the issue of whether or not these employment and consultation agreements were annexed to the purchase agreement. *Compare* par. 18 *with* pars. 17 and 25.

21. *Id.* at par. 29.

22. *Id.* at pars. 13 and 14. Allegedly, defendant Miller received $50,000; defendant York received $43,000; defendant Cirrito received $20,000; and defendant Toczek received $193,500.

the RICO statute. We are constrained to answer in the negative.[23]

We begin our analysis with the applicable RICO provision, 18 U.S.C. § 1964(b), which reads:

> "Any person injured in his business or property by *reason of a violation of section* 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

The relevant portion of § 1962, 18 U.S.C. § 1962(c) reads:

> "It shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity...."

"Racketeering activity" is also defined by the RICO statute:

> " 'Racketeering activity' means ... any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)...." 18 U.S.C. § 1961(1)(B).

A "pattern of racketeering activity" requires "at least two acts of racketeering activity...." 18 U.S.C. § 1961(5).

Defendants argue, *inter alia*, that plaintiffs have failed to plead that Bruns was an "enterprise" within the meaning of § 1962(c), *supra*; that a sale of a business constitutes "affairs" within the meaning of § 1962(c); and that there was a "pattern of racketeering activity" within the meaning of § 1962(c). These arguments are nothing more than semantical strawmen—leaving nothing of substance upon which to predicate a dismissal. Surely, Bruns, until it was sold, was an "enterprise" which is defined as "any individual, partnership [or] corporation." 18 U.S.C. § 1961(4). The sale of a business (and all the transactions inherent therein) is "affairs of that enterprise"; and clearly, a "pattern of racketeering activity" is alleged as 2 or more acts of wire and mail fraud have been alleged.

Mail fraud is committed under 18 U.S.C. § 1341 when there exists: (a) a scheme to defraud; and (b) use of the mails. *See e.g., Stern v. U.S.*, 223 F. 763 (2d Cir.1915). Plaintiffs have alleged that defendants mailed several letters to plaintiffs in furtherance of their scheme to defraud and this is sufficient under the statute. Wire fraud is committed under 18 U.S.C. § 1343 where a telephone conversation takes place in furtherance of a scheme to defraud. Facts relating to the various telephone conversations in furtherance of the scheme to defraud have been alleged and are sufficient under the wire fraud statute. *Id.*

As to defendant's argument that plaintiffs must plead a "tie to organized crime," the Second Circuit has answered in the negative. *Moss v. Morgan Stanley, Inc. et al.*, 719 F.2d 5 at p. 21 (2d Cir.1983). Indeed, the panel of our Circuit Court noted:[24]

> The *district court stated that 'application of RICO should be restricted sharply to organized crime and the enterprises on which its talons have fastened. Thus, courts in the Southern District and elsewhere have held that RICO claims for damages could be maintained only if there was a tie to organized crime'* 553 F.Supp. at 1361 (citing *Noonan v. Granville-Smith*, 537

---

**23.** Because dismissal is so appropriate here, we do not consider that branch of defendants' motion which seeks to compel arbitration.

**24.** Before the definitive statement by the Second Circuit in *Moss*, Judges in this circuit were split on this pleading requirement. *Compare Mauriber v. Shearson/American Express*, Fed.Sec.L. Rep. ¶ 98,857 at pp. 94,421–2 (S.D.N.Y.1982) and *Meineke Discount Muffler Shops, Inc. v. Noto*,

548 F.Supp. 352, 354 (E.D.N.Y.1982) with *Moss v. Morgan Stanley, Inc.*, 553 F.Supp. 1347 at p. 1359 (S.D.N.Y.1983) and *Minpeco S.A. v. Conticommodity Services, Inc.*, 558 F.Supp. 1348 at pp. 1350–1351 (S.D.N.Y.1983). It is also unclear that *Moss* will remain as the definitive statement on this RICO pleading requirement. *The Trane Company v. O'Connor Securities et al.*, 718 F.2d 26 at p. 28 fn. 3 (2d Cir.1983).

F.Supp. 23, 29 (S.D.N.Y.1981); *Barr v. WUI/TAS, Inc.,* 66 F.R.D. 109, 112–13 (S.D.N.Y.1975); and *Waterman Steamship Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256, 260 (E.D.La.1981); *accord Wagner v. Bear, Stearns & Co.,* [current] Fed.Sec.L.Rep. (CCH) par. 99,-032 (N.D.Ill.1982); *City of Atlanta v. Ashland-Warren, Inc.,* 1982–1 Trade Cas. (CCH) par. 64,527 (N.D.Ga.1982).

It is true that RICO's legislative history states that it was enacted to provide 'enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.' Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922, *reprinted* in 1970 U.S.Code Cong. & Ad.News 1073; *see United States v. Ivic,* 700 F.2d 51, 62 (2d Cir.1983). *The language of the statute, however, does not premise a RICO violation on proof or allegations of any connection with organized crime.* (footnotes omitted) (emphasis added)

■ However, defendants' final argument that plaintiffs' failure to plead a distinct RICO injury positively compels dismissal. The fundamental statutory predicate which permits a civil RICO action reads:

"Any person injured *in his business or property by reason of* a violation of section 1962 of this chapter may sue therefor...." 18 U.S.C. § 1964(b) (emphasis added).

The pertinent portion of 18 U.S.C. § 1962 defines the prohibited act as "to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." A pattern of racketeering activity includes 2 or more acts of mail and/or wire fraud. District Courts in the Southern District have, without exception, concluded after reviewing the foregoing statutory language that a RICO plaintiff must allege more than injury from the predicate acts of mail and/or wire fraud—something not done here.

Judge Pollack reasoned this way:

"The use of the mails or the sale of securities are named as two of the methods by which the enumerated Section 1961 activities prohibited in Section 1962 may fall under the ban. The cardinal question at the threshold is whether there has been a commission of one of the enumerated prohibited activities— one of the racketeering crimes in the course of organized crime defined by the RICO statute—which has caused injury to the plaintiff. RICO was thus established as a civil weapon against those engaged in organized crime who have gained an unfair *competitive* or *financial* advantage through criminal means associated with racketeering. The statutory offenses created by RICO were aimed at the evils of criminal racketeering by organized crime that had spread through the economy. *U.S. v. Turkette,* 452 U.S. 576, 589 [101 S.Ct. 2524, 2531, 69 L.Ed.2d 246] (1981). The sweep of the statute does not embrace ordinary violators charged in common law fraud actions or federal securities law violations as the predicate offenses for RICO relief, albeit the use thereof to accomplish one of the enumerated felonies in the statute may be an element of and lead to RICO liability if organized criminals engage in the prohibited activity. The supporting civil remedies of the statute were designed against organized criminals and terrorists as an additional weapon in the crime fighters' arsenal. In other words, plaintiffs' injury to be cognizable under RICO must be caused by a RICO violation and not simply by the commission of a predicate offense, such as mail fraud or federal securities fraud. RICO's civil remedy provision permits a recovery to 'any person injured in his business or property by reason of a violation of Section 1962,' 18 U.S.C. Section 1964(c), that is, where the distinctive RICO violation contributed to plaintiffs' injury, i.e., where the plaintiff suffered directly a racketeering enterprise injury at the hands of those sought to be reached by the Organized Crime Control Act of 1970.... The purpose was to provide 'enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized

crime.' Congressional Statement of Findings and Purposes, Pub.L. No. 91–452, § 1.84 Stat. 922, 923. It has appropriately been said: *'The civil remedies provisions of RICO were not designed to convert every fraud or misrepresentation action involving corporations who use the mails or telephones to conduct their business in interstate commerce into treble damage RICO actions. Waterman SS Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256, 260 (E.D.La.1981)....' Moreover, there is nothing in the legislative history to suggest that Congress intended to create a private right of action for treble damages for violations of substantive statutes by ordinary business or parties. For example, it was clearly established at the time that RICO was enacted that there was no private right of action for violations of the mail fraud statute. It is implausible that Congress could have meant to alter this accepted rule to the extent of creating a right of action for treble damages without a single mention of such a revolutionary consequence any where in the legislative history."

*Moss, supra* at pp. 21–22 (emphasis added). *See also Richardson v. Shearson/American Express,* 573 F.Supp. 133 at 137 (S.D.N.Y.1983).

Judge Sweet put it this way:

"[Plaintiff], however, has failed ·to state a cause of action under RICO since she has failed to assert an injury resulting from the racketeering enterprise violation. The only injury. alleged is from the predicate acts which are asserted to have established the pattern of racketeering activity. In *Landmark Sav. & Loan v. Rhoades,* 527 F.Supp. 206, 208–209 (E.D.Mich.1981), the Honorable James P. Churchill determined that a civil RICO damage action requires an allegation of a 'racketeering enterprise injury,' some injury resulting from the violation of Section 1962 rather than merely the predicate acts. Judge Churchill drew an analogy to the similarly drafted treble damage provision of Section 4 of the Clayton Act, 15 U.S.C. § 15 N1. In con-

struing the Clayton Act, the Supreme Court in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 [97 S.Ct. 690, 697, 50 L.Ed.2d 701] (1977), determined that to recover treble damages for an antitrust violation the plaintiff 'must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury ... The injury should reflect the anti-competitive acts made possible by the violation...' [A] similar analysis is required under RICO. Requiring the assertion of a 'racketeering enterprise injury' is also consistent with the distinctions that have been drawn between the violation of RICO and the criminal violations which constitute the predicate acts which serve to establish the pattern of racketeering activity.... *Since a party can be convicted and punished separately and consecutively for the predicate acts and the RICO violation, civil remedies should similarly be available separately and cumulatively since the remedies reflect recovery for different wrongs."* *Alton v. Alton,* No. 82 Civ. 0795 (RWS) slip op. at pp. 5–6 (S.D.N.Y.1982) (Emphasis added).

■ Having reviewed the requirement of pleading a "racketeering enterprise injury," we turn to the allegations contained in the complaint regarding damages. Plaintiffs allege damages as follows:

Plaintiffs were damaged by defendants' pattern of racketeering activity in amounts to be determined at discovery and trial. Damages include, but are not limited to, the following:

(a) On information and belief, had plaintiffs been aware from the outset of the negotiations with Bache that their consent was necessary to the consummation of the Purchase Agreement, they would have been enabled to bargain for and receive from defendants Rea and Coleman sums comparable or larger than the payments bestowed upon defendants as alleged hereinabove in paragraph 13.

(b) Each plaintiff was forced to accept employment on terms and conditions that could have been improved had the defendants negotiated impartially on behalf of all Bruns' partners or had plaintiffs been aware of the opportunity to negotiate on their own behalfs.

(c) On information and belief, because of the insistence by certain members of the Executive Committee on favorable and lucrative employment arrangements for themselves with Bache, Bache was induced to lower the price it was willing to pay for Bruns' assets, thereby reducing the consideration flowing to the partnership as a whole (of which plaintiffs were to receive their percentage shares), and increasing the consideration to defendants personally (in which plaintiffs would not share at all).

(d) On information and belief, as a result of the payoffs described above, the Executive Committee failed to discharge its duty of finding the potential purchaser willing to make the largest offer for Bruns' assets.

Complaint, par. 32.

What is significant about these damage allegations is that they are identical to the damage allegations for the common law fraud claim—and not in any way distinct, racketeering enterprise injuries. Indeed, the damage allegation for the fraud claim for relief reads: "As a result of the wrongful acts of defendants, plaintiffs have been damaged to the extent alleged in paragraph 32 above [—the paragraph alleging the RICO damages.]" *Id.* at par. 42.

Clearly then, because of the identical nature of the fraud and RICO damage allegation, the complaint should be dismissed on the ground that plaintiffs have failed to allege a separate, distinct racketeering enterprise injury.

Accordingly, we are constrained to, and hereby do, dismiss the complaint on the ground hereinabove indicated.

SO ORDERED.