# STATE OF MICHIGAN

# COURT OF APPEALS

MANITOU NORTH AMERICA, INC.,

       Plaintiff-Counterdefendant-
       Appellant,

UNPUBLISHED
February 2, 2016

v

MCCORMICK INTERNATIONAL, LLC,

       Defendant-Counterplaintiff-
       Appellee.

No. 324063
Ionia Circuit Court
LC No. 2007-025692-CZ

Before: OWENS, P.J., and MURPHY and HOEKSTRA, JJ.

PER CURIAM.

Plaintiff Manitou North America, Inc. (Manitou NA), appeals as of right a judgment entered by the trial court, pursuant to a jury-trial verdict, awarding defendant McCormick International, LLC (McCormick), $1.3 million in damages on McCormick's counterclaim under the Michigan Farm and Utility Equipment Act (MFUEA), MCL 445.1451 *et seq.*, and $3.85 million in damages on McCormick's counterclaim under the Michigan Antitrust Reform Act (MARA), MCL 445.771 *et seq.* We affirm the verdicts to the extent that they found MFUEA and MARA violations, and we affirm the damage award with respect to the MARA violation. However, we vacate and remand for remittitur proceedings in regard to the damage award relative to the MFUEA violation, as it was based on an overly speculative claim of lost profits.

This case concerned the manufacture, distribution, and sale of telescopic handlers, or telehandlers, which look like forklifts and perform similar functions, but are more versatile in that they have a telescopic boom that can be extended forward and upward. Manitou NA distributed telehandlers designed and manufactured by its parent company, Manitou BF S.A. (Manitou France), to a network of dealers throughout the United States.[1] On October 19, 2000, McCormick and Manitou NA entered into a dealer marketing agreement, making McCormick an authorized dealer of Manitou NA products, including telehandlers. Pursuant to a side agreement

---

[1] Any reference to "Manitou" in this opinion encompasses both Manitou NA and Manitou France.

-1-

dated October 24, 2000, which was signed by Mr. Denis McCormick[2] and Manitou NA's regional sales manager, McCormick became an exclusive dealer of Manitou telehandlers in a territory spanning the state of Michigan, northern Indiana, and the greater Toledo, Ohio area. Mr. McCormick testified at trial consistently with this document, as did Manitou NA's regional sales manager during his deposition, which was read into the trial record. Additionally, at summary disposition, McCormick presented an affidavit by a former dealer representative for Manitou NA who averred that "it was [his] understanding that McCormick had an exclusive territory for the sale of Manitou telescopic handler and forklift products comprised of Michigan, northern-Indiana and northwest-Ohio." With respect to the October 24, 2000 exclusivity or side agreement, it provided that "McCormick must achieve at least a 2 ½ [percent] market share by the end of the year 2001 and increase sales by at least 10 [percent] each year after that." Mr. McCormick testified that sales and any increases were to be measured in terms of revenue generated by the sale of telehandlers. He further testified to having to commit to an initial purchase of 42 telehandlers from Manitou NA at a cost of $2 million.

There was evidence that McCormick achieved a market share of five percent in 2001, doubling the 2 ½ percent requirement, on telehandler revenue of $1.69 million (profit of $404,375 after costs). In 2002, McCormick had telehandler revenue of only $755,780 (profit of $141,968 after costs), thereby failing to increase sales by at least 10 percent from the 2001 level and instead losing sales. In 2003, McCormick had telehandler revenue of $804,724 (profit of $160,063 after costs), which, while representing a small increase from 2002, was still less than half of the telehandler revenue generated in 2001. McCormick specifically attributed the decrease in sales in 2002 and 2003, as compared to those in 2001, to Manitou NA directly providing telehandlers to Osentoski Farm Equipment, Inc., in Bad Axe, Michigan,[3] and to a 2002 agreement between Manitou France and competitor OmniQuip. Under this agreement, OmniQuip began distributing certain Manitou telehandlers, described by Mr. McCormick as his "bread and butter" models, to OmniQuip dealers in Michigan who competed against McCormick. The arrangement between Manitou France and OmniQuip ended in 2004. In 2004, McCormick rebounded and had telehandler revenue of approximately $1.6 million (profit of $303,862 after costs). Mr. McCormick testified that sales in 2004 would have been higher and would have eclipsed the 10-percent mark, the base of which was set in 2001,[4] except that

---

[2] Denis McCormick, along with his wife, Jane McCormick, owned McCormick.

[3] There was evidence showing that McCormick had been selling telehandlers to Osentoski at a lower than normal profit margin, with Osentoski then selling the telehandlers to consumers. McCormick viewed Osentoski as a sub-dealer of telehandlers. However, Osentoski subsequently began purchasing telehandlers directly from Manitou NA for resale, cutting McCormick out of the picture.

[4] Using the $1.69 million revenue figure from 2001 as the base, a 10-percent upward progression, had it been met, would have produced $1.85 million in revenue for 2002, $2.04 million in revenue for 2003, $2.24 million in revenue for 2004, $2.47 million in revenue for 2005, and $2.72 million in revenue for 2006. Mr. McCormick's testimony supported these calculations.

OmniQuip was clearing out its inventory and selling telehandlers at reduced prices. McCormick's counterclaim under the MFUEA was based on an alleged change in competitive circumstances, absent good cause, from those circumstances that existed under the 2000 McCormick-Manitou NA agreement, which change was caused, in part, by the improper deals with OmniQuip and Osentoski.[5]

In July 2004, an OEM Supply Agreement was executed by Manitou NA, Manitou France, and Gehl Company, forming a strategic alliance between Manitou and Gehl.[6] We shall discuss in detail below the substance of this agreement, which McCormick claimed violated the MFUEA by increasing telehandler competition against McCormick in its contracted-for exclusive territory via numerous Gehl dealers now being able to sell Manitou designed or manufactured telehandlers, while also preventing McCormick from purchasing and reselling Gehl telehandlers or acting as a Gehl dealer in violation of the MARA. In 2005, McCormick had telehandler revenue of nearly $2.3 million (profit of $442,328 after costs). However, Mr. McCormick testified that he still did not meet the 10-percent sales increase requirement (see footnote 4), that nearly half of its 2005 sales were permissibly made outside of McCormick's exclusive territory in response to Hurricane Katrina, and that there were actually significantly fewer telehandler sales in 2005 than in 2004 with respect to McCormick's exclusive territory, which reduction Mr. McCormick blamed on the 2004 OEM Supply Agreement.[7] And in 2006, McCormick had telehandler revenue of only $606,983 (profit of $186,050 after costs), which decrease was also attributed to the 2004 agreement. The 2004 agreement between Manitou NA, Manitou France, and Gehl served, in conjunction with the earlier OmniQuip deal and Osentoski arrangement, as additional support for McCormick's MFUEA counterclaim, and the 2004 agreement was the sole basis of McCormick's MARA counterclaim.

In early 2007, McCormick terminated the 2000 dealer agreement with Manitou NA, complaining about the negative impact of the 2004 OEM Supply Agreement on sales and the failure of support from Manitou NA in connection with telehandler parts, service, and pricing. In July 2007, Manitou NA filed suit against McCormick, seeking declaratory relief with regard to

---

[5] MCL 445.1457a(1), which is part of the MFUEA, provides, in pertinent part, that "[a] supplier shall not terminate, cancel, fail to renew, or substantially change the competitive circumstances of an agreement without good cause." Mr. McCormick testified that two or three other dealers were also apparently selling Manitou telehandlers within McCormick's exclusive territory.

[6] The agreement indicated that "Manitou France is a world-leading company in the field of designing, manufacturing and marketing telescopic handlers for the construction, agricultural and industrial markets, and Manitou N.A. is its subsidiary responsible for the distribution of such products in the US market." The agreement identified Gehl as "a leading company in the field of designing, manufacturing and marketing compact equipment, including telescopic handlers, for the construction and agricultural markets[.]" Gehl had hundreds more authorized dealers in the United States than Manitou.

[7] Mr. McCormick testified that it was in the second half of 2005 that the full implementation of the 2004 agreement started impacting his business.

the parties' rights and obligations under the MFUEA, mainly on the question whether McCormick's inventory had to be repurchased by Manitou NA, and alleging breach of contract for nonpayment with respect to one telehandler that McCormick had acquired from Manitou NA in 2006.[8] In September 2007, McCormick filed its MFUEA counterclaim and, on leave to amend granted by the trial court, McCormick added the MARA counterclaim in September 2010.[9] The trial court entertained a slew of motions for summary disposition, denying most of them, and the case subsequently went to trial on McCormick's MFUEA and MARA counterclaims, where the jury found in favor of McCormick on both counts. Judgment on the jury verdict was later entered by the trial court on March 31, 2014. McCormick was awarded $1.3 million in damages on the MFUEA counterclaim, $3.85 million in damages on the MARA counterclaim, $175,980 in attorney fees, $73,469 in taxable costs, and $527,667 in judgment interest. The trial court denied Manitou NA's motions for new trial, judgment notwithstanding the verdict, and remittitur.

Manitou NA argues on appeal that McCormick's MARA counterclaim was time-barred, that the MARA counterclaim should have been analyzed under the rule of reason, that the MARA counterclaim failed as a matter of law given that McCormick did not adequately plead or prove an antitrust injury, that McCormick's evidence on damages should have been excluded as a discovery sanction, that the MFUEA lost-profit damages were too speculative to support the $1.3 million award, that there was no loss associated with the MARA counterclaim, and that the trial court, minimally, should have granted Manitou NA's post-trial motion for remittitur.

We shall initially address Manitou NA's arguments that the MARA counterclaim should have been analyzed under the rule of reason and that it failed as a matter of law given that McCormick did not adequately plead or prove an antitrust injury. MCL 445.772 provides, in pertinent part, that "[a] contract . . . between 2 or more persons in restraint of . . . trade or commerce in a relevant market is unlawful." A "person threatened with injury or injured directly or indirectly in his or her business . . . by a violation of [the MARA] may bring an action for . . . actual damages sustained by reason of a violation of this act, and, as determined by the court, interest on the damages from the date of the complaint, taxable costs, and reasonable attorney's fees." MCL 445.778(2). MCL 445.784(2) states that "[i]t is the intent of the legislature that in construing all sections of [the MARA], the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes, including, without limitation, the doctrine of per se violations and the rule of reason." Comparable to § 2 of the MARA (MCL 445.772), the Sherman Act, 15 USC 1 *et seq.*, provides, in relevant part, that "[e]very contract . . . in restraint of trade or commerce among the several States, or with foreign nations, is declared

---

[8] The breach of contract claim was eventually settled by the parties, and in November 2008, the trial court granted summary disposition in favor of Manitou NA on its request for declaratory relief, concluding that Manitou NA had no obligation under the MFUEA to repurchase inventory from McCormick.

[9] McCormick went out of business in 2008, allegedly due to the unlawful conduct and actions by Manitou NA.

to be illegal." 15 USC 1. Accordingly, we must give due deference, in construing MCL 445.772, to federal court decisions interpreting 15 USC 1.

In *United States v Topco Assoc, Inc*, 405 US 596, 607-608; 92 S Ct 1126; 31 L Ed 2d 515 (1972), the United States Supreme Court, construing § 1 of the Sherman Act, observed:

> The history underlying the formulation of the antitrust laws led this Court to conclude . . . that Congress did not intend to prohibit all contracts, nor even all contracts that might in some insignificant degree or attenuated sense restrain trade or competition. In lieu of the narrowest possible reading of § 1, the Court adopted a "rule of reason" analysis for determining whether most business combinations or contracts violate the prohibitions of the Sherman Act. An analysis of the reasonableness of particular restraints includes consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption.

> While the Court has utilized the "rule of reason" in evaluating the legality of most restraints alleged to be violative of the Sherman Act, it has also developed the doctrine that certain business relationships are per se violations of the Act without regard to a consideration of their reasonableness. . . . .

> It is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act. One of the classic examples of a per se violation of § 1 is *an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action is usually termed a "horizontal" restraint*, in contradistinction to combinations of persons at different levels of the market structure, e.g., manufacturers and distributors, which are termed "vertical" restraints. This Court has reiterated time and time again that horizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition. Such limitations are per se violations of the Sherman Act. [Citations, quotation marks, and parenthetical omitted; emphasis added; final ellipsis in original.]

Here, the July 2004 OEM Supply Agreement between Manitou NA, Manitou France, and Gehl Company, as relevant to the MARA counterclaim, provided:

> Non-Solicitation. During the term of this Agreement and for a period of two years thereafter, neither party shall either solicit any then still authorized dealer that is handling products manufactured by the other party on the date of this Agreement to begin handling *competing telescopic handlers* manufactured by the former party or enter into any agreement under which such dealer would begin to do so; provided, however, that nothing herein shall preclude either party from entering into any such agreement with any authorized dealer that on the date of this Agreement is handling products manufactured by both of the parties. [Emphasis added.]

This contract provision clearly constituted a horizontal restraint on trade and per se violation of the MARA, entailing an agreement between manufacturers/distributors at the same level of the market structure not to compete against each other relative to certain telehandlers and particular dealers, including McCormick, which was a Manitou NA, but not a Gehl, authorized dealer, thereby reducing telehandler competition at various business sites. See *United States v Coop Theatres of Ohio, Inc*, 845 F2d 1367, 1373 (CA 6, 1988) ("In sum, we find that the so-called 'no-solicitation' agreement [between movie theater booking agents] . . . is undeniably a type of customer allocation scheme which courts have often condemned in the past as a *per se* violation of the Sherman Act.").[10] Accordingly, contrary to Manitou NA's argument, the rule of reason was not implicated in this case. However, establishment of a per se violation of the MARA does not mean that an antitrust injury was shown. In *Atlantic Richfield Co v USA Petroleum Co*, 495 US 328, 344; 110 S Ct 1884; 109 L Ed 2d 333 (1990), the United States Supreme Court held that proof of an antitrust injury and of a per se violation are distinct matters that must be established independently. The Court elaborated:

> Conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior. The need for this showing is at least as great under the *per se* rule as under the rule of reason. Indeed, insofar as the *per se* rule permits the prohibition of efficient practices in the name of simplicity, the need for the antitrust injury requirement is underscored. Procompetitive or efficiency-enhancing aspects of practices that nominally violate the antitrust laws may cause serious harm to individuals, but this kind of harm is the essence of competition and should play no role in the definition of antitrust damages. [*Id.* at 343-344 (citation, quotation marks, and alteration bracket omitted).[11]]

To show an antitrust injury, a party must prove that the claimed loss flowed from an anticompetitive aspect of the contract or conspiracy, not aspects that were neutral or beneficial to competition, even if there was a per se violation of the antitrust laws. *Pool Water Prod v Olin Corp*, 258 F3d 1024, 1034 (CA 9, 2001). " 'It is well established that the antitrust laws are only intended to preserve competition for the benefit of consumers.' " *Id.* (citation omitted); see also *King Drug Co of Florence, Inc v Smithkline Beecham Corp*, 791 F3d 388, 405 (CA 3, 2015) ("Antitrust law is designed to protect consumers from arrangements that prevent competition in the marketplace."). The antitrust laws were enacted to protect competition, not competitors.

---

[10] Although *Coop Theatres* was a criminal case brought under the Sherman Act, the conclusion that the booking agents' "no-solicitation" agreement was a per se violation of § 1 of the Sherman Act would be equally applicable in the context of a civil action. The MARA also contains criminal penalties for violations of § 2 of the MARA. MCL 445.779.

[11] The jury here was instructed in accordance with the antitrust-injury principles enunciated in *Atlantic Richfield*.

*Brunswick Corp v Pueblo Bowl-O-Mat, Inc*, 429 US 477, 488; 97 S Ct 690; 50 L Ed 2d 701 (1977).[12]

Manitou NA contends that McCormick failed to adequately allege an antitrust injury in its amended counterclaim. We disagree. In regard to its MARA restraint-of-trade counterclaim, McCormick alleged, in pertinent part, as follows:

> 47. At the time of the Agreement [2004 OEM Supply Agreement between Manitou and Gehl], Manitou sold telescopic handlers in Michigan.
>
> 48 At the time of the Agreement[,] Gehl sold or was preparing to sell telescopic handlers in Michigan.
>
> 49. At the time of the Agreement, McCormick was an authorized dealer of Manitou equipment, including telescopic handlers.
>
> 50. Through . . . the Agreement, Manitou and Gehl Corporation sought to restrain one another from entering into relationships with then existing authorized dealers of the other party.
>
> 51. As a direct result of the Agreement, McCormick was prohibited from becoming an authorized dealer or reseller of Gehl telescopic handlers.
>
> WHEREFORE, McCormick requests judgment in its favor and against Manitou for all damages allowable pursuant to the [MARA] . . . .

These allegations reflected a claim by McCormick that the 2004 agreement caused it to suffer an antitrust injury, given that the non-solicitation aspect of the agreement, which constituted a per se violation of the MARA and was thus inherently anticompetitive, precluded McCormick from purchasing Gehl telehandlers and reselling them to patrons, resulting in MARA damages. Under the 2004 agreement, consumers seeking to purchase telehandlers who visited or made inquiries through either Manitou-only or Gehl-only authorized dealers were limited in their selection because of the non-solicitation component of the agreement that effectively allocated markets/dealers. For example, consistently with the agreement, if a prospective customer seeking a certain type of telehandler that was manufactured and distributed by both Manitou and Gehl ("competing telescopic handlers") went to a Gehl-authorized dealer, who was not authorized to also sell Manitou telehandlers, the customer would not be able to purchase a Manitou telehandler at that location; this would be reflective of reduced competition. And, here, McCormick's claimed injury, at least for purposes of its MARA claim, stemmed from

---

[12] Given the precedent, we reject McCormick's argument, which does not allude to any supporting authority, that the relevant consumer or marketplace pertained to telehandler dealers, not consumers purchasing telehandlers from dealers.

-7-

this competition-reducing aspect of the 2004 agreement – Gehl telehandlers could not be purchased by McCormick and then resold to McCormick's patrons; McCormick could not become a Gehl dealer. This bar to having a business relationship with Gehl directly and negatively impacted McCormick's sales and its ability to survive in the marketplace. While perhaps McCormick's MARA counterclaim could have provided some further elaboration in describing the antitrust injury, the specific allegations that were included reasonably informed Manitou NA of the nature of the claim that Manitou NA was called on to defend. MCR 2.111(B)(1).[13]

Manitou NA next contends that McCormick's MARA counterclaim should have been summarily dismissed because of a failure to submit documentary evidence sufficient to create a genuine issue of material fact relative to showing an antitrust injury. Manitou NA had argued that McCormick conceded at the summary disposition stage that the 2004 agreement injected additional competition into the marketplace. We initially take note of some relevant procedural history in this case. In September 2010, Manitou NA filed a motion for summary disposition with respect to McCormick's MARA counterclaim,[14] arguing, in part, that McCormick had failed to allege an antitrust injury, MCR 2.116(C)(8). The trial court rejected that argument and denied the motion in March 2011. In May 2011, McCormick filed a motion for partial summary disposition, arguing that the 2004 Manitou-Gehl agreement constituted a per se horizontal restraint of trade in violation of the MARA and should be recognized as such as a matter of law. In response to McCormick's motion, Manitou NA argued that McCormick had conceded in answers to interrogatories, which were attached to Manitou NA's brief, that the 2004 agreement had increased competition in the marketplace to McCormick's detriment. We shall momentarily discuss the interrogatory answers. On the same day in May 2011 that McCormick filed its motion for partial summary disposition, Manitou NA filed a new motion for summary disposition relative to McCormick's MARA counterclaim, this time arguing under MCR

---

[13] We would also point out an interesting distinction between the MARA and the Sherman Act. As indicated above, MCL 445.778(2) authorizes an action for damages when a person is "injured directly *or indirectly* in his or her business . . . by a violation of [the MARA]." (Emphasis added.) Section 15 of the Sherman Act authorizes an action for damages when a person is "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 USC 15(a). The Sherman Act does not reference *indirect* injuries. To the extent that the anticompetition or competition-reducing aspect of the 2004 agreement, i.e., the non-solicitation provision, *indirectly* caused injury to McCormick, the MARA would appear to provide relief in the form of damages. However, the jury was ultimately instructed, on the basis of federal law, that McCormick had to establish a direct injury to its business. There is no issue on appeal concerning the instruction, and our analysis does not rely on an indirect antitrust injury.

[14] McCormick had also pursued a "monopoly" counterclaim under the MARA, MCL 445.773, which was eventually dismissed and never resurrected, and our discussion in this opinion regarding McCormick's MARA counterclaim pertains solely to the MARA restraint-of-trade claim alleged by McCormick and presented to the jury.

2.116(C)(10) that McCormick had failed to create a genuine issue of material fact in regard to showing an antitrust injury. McCormick filed a response brief and attached documentary evidence, contending that an antitrust injury had been sufficiently shown for purposes of surviving summary disposition under MCR 2.116(C)(10). We shall address McCormick's argument and evidence below. The trial court denied both motions.[15]

With respect to the answers to interrogatories, McCormick indeed indicated, when asked to identify and describe its MARA injury, that the 2004 agreement "injected additional competition into McCormick's marketplace." However, McCormick further stated in its answer that the 2004 agreement also "prevent[ed] McCormick from seeking competitive trade advantage in the marketplace on its own through Gehl." It is important to understand and grasp that the 2004 Manitou-Gehl agreement had language that was anticompetitive or competition-reducing in nature – the non-solicitation provision discussed above – and language that could be viewed as injecting or increasing competition in the marketplace, which served, in part, as the basis of McCormick's MFUEA counterclaim. Aside from the non-solicitation clause, the 2004 agreement also provided:

> [Each] of the parties wishes to expand the scope of the line of telescopic handlers that it can offer to its customers by purchasing from the other certain telescopic handlers that differ from those currently in its line of telescopic handlers . . . .

> [Manitou] France and Gehl have contemporaneously entered into a Manufacturing License, Technical Assistance and Supply Agreement . . . under which Gehl has acquired the right to manufacture in the U.S. two models of telescopic handler families designed by Manitou . . . for sale by Gehl under its own trade names and trademarks . . . .

The 2004 agreement called for Manitou to manufacture products and parts for sale to Gehl and for Gehl to manufacture products and parts for sale to Manitou under various parameters set forth in the agreement. The agreement also essentially required any products and parts designed or manufactured by one of the parties, but ultimately destined for distribution by the other party to its dealers, to be painted and labeled in accordance with the demands of the receiving or distributing party, subject to the requirements of federal law and regulations concerning the identification of a manufacturer, although "no more conspicuous than required." For example, a telehandler manufactured by Manitou, or a telehandler designed by Manitou but manufactured by Gehl, which was to eventually be distributed by Gehl to dealers, had to be painted yellow, which was Gehl's color, while, flipping the scenario, a telehandler to eventually be distributed by Manitou had to be painted red. These contractual provisions in the 2004 agreement effectively opened the door for at least ten Gehl dealers in McCormick's Manitou-exclusive territory to begin selling, at a substantially lower price given various incentives offered

---

[15] During the trial, the trial court altered its decision in regard to whether the 2004 agreement constituted a per se horizontal restraint of trade in violation of the MARA, concluding that it did as a matter of law.

to Gehl dealers, certain Gehl-branded telehandlers that were actually designed and/or manufactured by Manitou, destroying McCormick's competitive edge and injuring its business. The theory underlying McCormick's MFUEA counterclaim was based, in part, on these competition-injecting or competition-enhancing provisions of the 2004 agreement that substantially changed the competitive circumstances enjoyed by McCormick under its 2000 dealer marketing agreement with Manitou NA; these provisions could not, however, support the MARA counterclaim. But the MARA counterclaim was based on the separate non-solicitation provision found in the 2004 agreement.[16]

In its brief opposing Manitou NA's motion for summary disposition under MCR 2.116(C)(10) relative to the MARA counterclaim and the antitrust injury issue, McCormick argued that the non-solicitation clause in the 2004 agreement prevented "retail dealers such as McCormick from entering into any agreements to sell the competing party's telescopic handlers." McCormick also maintained that it suffered a direct injury as a result of the non-solicitation clause, where McCormick was not given the opportunity to purchase and resell Gehl telehandlers. In the affidavit by the former dealer representative for Manitou NA, he averred that in or around the summer or early fall of 2005, "McCormick needed inventory of telescopic handlers and . . . attempted to purchase ten (10) such units from Gehl . . ., as the units were the same as those provided by Manitou . . . ." The former representative further averred that he had personal knowledge that Manitou NA contacted a Gehl representative "and instructed Gehl that it could not make any such sale of telescopic handler[s] . . . to McCormick[,]" and that, "[a]s a result, Gehl refused to sell the telescopic handlers to McCormick, and subsequently, McCormick had no inventory for resale to customers." An affidavit by Mr. McCormick was also submitted for purposes of summary disposition, and he averred that he "contacted Gehl in or around 2005/6 to purchase telescopic handlers for resale[,]" that it was his "understanding from Gehl that Manitou . . . had contacted [Gehl] to prevent any sale of units to [McCormick] because [he] was a Manitou dealer[,]" and that, as a result, McCormick "lost [a] 10 unit sale to a prospective customer." This evidence was sufficient to create a genuine issue of material fact regarding whether McCormick suffered an antitrust injury arising out of or stemming from the non-solicitation clause in the 2004 agreement, which clause was an anticompetitive provision and a per se violation of the MARA.[17] We note that at trial, Mr. McCormick testified that he attempted

---

[16] As noted in McCormick's appellate brief, "[t]he injury suffered from the non-solicitation provision [was] different from that caused by Manitou's decision to sell its telehandlers in McCormick's exclusive territory through Gehl[,]" and "[t]he latter claim was raised under MFUEA."

[17] We review de novo a trial court's ruling on a motion for summary disposition. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). With respect to the well-established principles governing the analysis of a motion for summary disposition brought pursuant to MCR 2.116(C)(10), this Court in *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013), stated:

> In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is

to purchase telehandlers from Gehl and to become a Gehl dealer, but he was blocked by Manitou NA in light of the 2004 agreement. When Mr. McCormick was asked what kind of effect this had on his overall business, he responded, "It destroyed it."

Manitou NA's arguments effectively confuse and blend together the two different claims raised by McCormick, one under the MARA and one under the MFUEA. Although McCormick could not compete, in part, because the 2004 agreement essentially allowed Gehl dealers in McCormick's territory to start selling Manitou designed or manufactured telehandlers that were branded as Gehl telehandlers, resulting in increased competition and lower prices in the marketplace from a consumer's perspective, this aspect of the 2004 agreement served to support the MFUEA claim. On the other hand, McCormick's inability to compete as caused by the MARA violation resulted from the non-solicitation clause in the 2004 agreement, where McCormick was prevented from purchasing and reselling Gehl telehandlers and from becoming a Gehl dealer. And the non-solicitation clause did not increase competition in the marketplace from a consumer's perspective; rather, it decreased competition, as explained earlier in this opinion, and McCormick's MARA injury stemmed from the non-solicitation clause. In sum, we reject Manitou NA's arguments that the rule of reason applied and that McCormick had failed to adequately allege and factually support an antitrust injury.

Next, with respect to whether the MARA counterclaim should have been dismissed on the basis of the four-year statute of limitations governing the action, MCL 445.781(2), which had indeed expired by the time McCormick amended its counterclaim in September 2010 to add the MARA allegations, we find it unnecessary to delve into the arguments regarding whether a discovery rule applied. We conclude that the amendment of the counterclaim to add the MARA count related back to the date of the original filing of the counterclaim, September 2007, at which time the limitations period had not elapsed relative to a MARA claim.

Although the relation-back issue was not reached by the trial court given its conclusion that the discovery rule applied to toll the limitations period, McCormick nevertheless did raise the issue at oral argument on its motion to amend the counterclaim, and Manitou NA argued in its summary disposition brief that the amended counterclaim could not relate back to the filing of

---

entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

the original counterclaim. We find that the issue was adequately preserved for appellate review.[18] MCR 2.118(D) provides, in pertinent part:

> An amendment that adds a claim or defense relates back to the date of the original pleading if the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth, or attempted to be set forth, in the original pleading.

In *Doyle v Hutzel Hosp*, 241 Mich App 206, 215; 615 NW2d 759 (2000), this Court, quoting *LaBar v Cooper*, 376 Mich 401, 406; 137 NW2d 136 (1965), observed:

> "The amendment relates back to the date of the original pleading and, therefore, is not barred by limitations, whenever the claim or defense asserted in the amendment arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. *It is thus beside the point that the amendment introduces new facts, a new theory, or even a different cause of action, so long as it springs from the same transactional setting as that pleaded originally.* The new test satisfies the basic policy of the statute of limitations, because the transactional base of the claim must still be pleaded before the statute runs, thereby giving defendant notice within the statutory period that he must be prepared to defend against all claims for relief arising out of that transaction." [Quotation marks omitted; emphasis in *LaBar*.]

Here, the transaction from which McCormick's MARA counterclaim arose was the 2004 OEM Supply Agreement, which also served as the transactional setting, in part, for the MFUEA counterclaim that was filed back in September 2007. Thus, while being a different cause of action or new theory, the MARA counterclaim nevertheless sprung from the same transactional setting as that pleaded originally relative to the MFUEA counterclaim. Accordingly, the filing of the amended counterclaim adding the MARA count in September 2010 related back to the original filing of the MFUEA counterclaim in September 2007, rendering the MARA counterclaim timely under the applicable four-year statute of limitations. The MARA counterclaim was not time-barred.

We now address the various arguments posed by Manitou NA challenging the damages awarded by the jury and the trial court's rejection of its post-trial motions attacking the damage awards. Manitou NA first argues that the award of $1.3 million in damages on the MFUEA counterclaim was based on an overly speculative claim of lost profits. McCormick's theory of damages was predicated on alleged lost profits for the years 2002 through 2006, as calculated by

---

[18] We also note that "this Court may overlook preservation requirements if the failure to consider the issue would result in manifest injustice, if consideration is necessary for a proper determination of the case, or if the issue involves a question of law and the facts necessary for its resolution have been presented[.]" *Smith v Foerster-Bolser Constr, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006). All three of these bases support examining and resolving the relation-back issue, even had the matter been unpreserved.

determining the profit that annually would have been earned had McCormick increased its sales by 10 percent each year as required by the 2000 exclusivity or side agreement. Mr. McCormick testified that, but for the improper agreements or arrangements between Manitou and Osentoski, OmniQuip, Gehl, and possibly two or three other dealers, McCormick would have indeed increased its sales by 10 percent each year. The heart of Manitou NA's appellate argument is that there was no foundation for Mr. McCormick's testimony that sales would have increased by 10 percent annually. Manitou NA complains that McCormick failed to present evidence showing actual lost telehandler sales to competitors in an amount necessary to support the claim that the 10-percent mark would have been reached in the years at issue. In an associated remittitur argument, Manitou NA maintains that there was evidence that Osentoski purchased nine telehandlers directly from Manitou NA during the relevant timeframe, which would have garnered $45,000 in profits for McCormick had McCormick dealt the telehandlers to Osentoski, and that McCormick lost only two Manitou telehandler sales to OmniQuip dealers, which cost McCormick $24,000 in lost profits.[19] And Manitou NA contends, accurately so, that there was no evidence of particular lost telehandler sales to Gehl dealers. Therefore, according to Manitou NA, McCormick had, at most, $69,000 in lost-profit damages relative to the MFUEA counterclaim. Additionally, Manitou NA contends that McCormick's telehandler business was a new business and that projecting future lost profits based solely on the excellent sales figures for 2001 was entirely speculative.[20]

In *Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 96; 706 NW2d 843 (2005), this Court discussed damage principles:

The general rule is that remote, contingent, and speculative damages cannot be recovered in Michigan in a tort action. A plaintiff asserting a cause of action has the burden of proving damages with reasonable certainty, and damages predicated on speculation and conjecture are not recoverable. Damages, however, are not speculative simply because they cannot be ascertained with mathematical precision. Although the result may only be an approximation, it is sufficient if a reasonable basis for computation exists. Moreover, the law will not demand that a plaintiff show a higher degree of certainty than the nature of the case permits. [L]ost profits are recoverable as damages on proper proof. . . . [W]hen the nature of a case permits only an estimation of damages or a part of the damages with certainty, it is proper to place before the jury all the facts and circumstances which have a tendency to show their probable amount. Furthermore, the certainty requirement is relaxed where damages have been established but the amount of damages remains an open question. Questions

---

[19] The record, and specifically the trial testimony of Mr. McCormick and Timothy Osentoski, supports Manitou NA's contentions. There was evidence that McCormick had made $5,000 in profit per telehandler sale to Osentoski and $12,000 in profit per telehandler sale to others.

[20] Manitou NA accepts the proposition that, in certain circumstances, a business owner can testify and establish lost profits with respect to the business, but only where there is a proper foundation and an adequate sales history.

regarding what damages may be reasonably anticipated are issues better left to the trier of fact. [Citations and quotation marks omitted.]

"In order to recover prospective profits, a plaintiff must establish proof of lost profits with a reasonable degree of certainty." *Joerger v Gordon Food Serv, Inc*, 224 Mich App 167, 175; 568 NW2d 365 (1997). "[E]ven if lost profits are difficult to calculate and speculative to some degree, they are still allowed as an item of loss." *Health Call*, 268 Mich App at 104.

While Mr. McCormick testified that the reason McCormick did not hit the annual 10 percent increase in sales was the infringement upon its exclusive territory by Osentoski, OmniQuip, Gehl, and others, as permitted and authorized by Manitou under agreements or arrangements with those dealers, the only evidence specifically identifying actual "lost" sales of Manitou telehandlers by the competing dealers during the relevant timeframe revealed that Osentoski purchased nine telehandlers directly from Manitou and then sold them to customers and that OmniQuip dealers sold two Manitou telehandlers to customers.[21] And these lost sales fell woefully short of supporting the claim that McCormick would have increased its sales by 10 percent each year but for Manitou NA's unlawful conduct.[22] There was no evidence whatsoever of the number of sales made by Gehl dealers relative to Manitou designed or manufactured telehandlers, let alone evidence that McCormick lost particular customers and sales to Gehl dealers. Mr. McCormick did not testify that he had personal knowledge of specific lost sales that, if added to actual sales, would have amounted to a 10 percent increase in annual sales for the years at issue. Instead, Mr. McCormick's testimony about lost sales and the 10-percent figure was framed in generalities and was vague and anecdotal.

Absent testimony by Mr. McCormick or another witness alluding to personal knowledge of particular lost sales or the specific number of Manitou telehandler sales actually made by the competing dealers, it was paramount for McCormick to present, minimally, some type of documentary evidence showing telehandler sales transacted by Gehl and OmniQuip dealers and Osentoski sufficient to support the 10-percent-increase theory. While there was general testimony by Mr. McCormick about the sale of Manitou manufactured or designed telehandlers by competing dealers within McCormick's exclusive sales territory, there was ultimately only evidence showing, with particularity, 11 sales of Manitou telehandlers by competitors. In its appellate brief, McCormick fails to direct our attention to evidence in the record showing actual sales beyond those 11. It was wholly inadequate to rely on evidence that simply referred to sales by competitors, such as Gehl dealers, without providing details and particulars regarding, at a minimum, the number of sales. There was no foundational support for McCormick's assertion that telehandler sales would have increased by 10 percent annually but for Manitou NA's violation of the MFUEA. The $1.3 million damage award was ultimately predicated on an overabundance of conjecture and speculation and not established by a reasonable certainty. The

---

[21] On cross-examination, Mr. McCormick testified that, as to OmniQuip, he was only personally aware of two lost sales to OmniQuip dealers and that there were no McCormick business documents showing lost sales to OmniQuip dealers.

[22] Mr. McCormick testified that the average telehandler sold for $60,000.

-14-

award did not constitute permissible approximation, as there was no reasonable basis for the computation. Our ruling does not demand mathematical precision; rather, it demands the presentation of some minimal evidence on actual lost sales.

We agree with the general proposition that, given the fluctuations in revenue as viewed in correlation with the 2002 and 2004 agreements that violated the MFUEA, it is reasonable to infer that McCormick's sales were probably negatively affected by the injection of competition concerning the sale of Manitou telehandlers. However, the *true or reasonably certain extent* of that impact, i.e., the *true or reasonably certain amount* of the lost profits, could only be measured by evidence reflecting or revealing the number of actual lost sales or the number of Manitou manufactured or designed telehandlers sold by competitors in McCormick's exclusive sales territory. For example, had McCormick submitted evidence that Gehl dealers within McCormick's exclusive territory had sold 50 Manitou designed or manufactured telehandlers during the pertinent timeframe comparable to those sold by McCormick, one could reasonably surmise, when considered in conjunction with Mr. McCormick's testimony, that McCormick was deprived of revenue and profits on the sale of those 50 telehandlers. But no such evidence was presented.

McCormick argues that the $1.3 million verdict should stand because Manitou NA failed to present an expert on damages to counter McCormick's damage request and because Manitou NA engaged in only cursory cross-examination of Mr. McCormick. These arguments lack merit, as it was McCormick that had the burden of establishing lost-profit damages, not Manitou NA. *Health Call*, 268 Mich App at 96. McCormick also contends that Manitou NA's "complaints about the lack of specific evidence about lost sales should [be] rejected outright as sheer chutzpah." McCormick presents this argument on the basis that it had made discovery requests to Manitou NA seeking the production of reports of telehandler sales in McCormick's exclusive territory for 2001 through 2007, but Manitou NA responded that it did not possess any such documents. And the trial court denied McCormick's motion to compel production. McCormick further argues that, in a second effort, it attempted to subpoena such documents shortly before trial; however, Manitou NA again indicated that it did not possess the reports.[23] We fail to see the relevancy of McCormick's argument, especially given that McCormick never appealed the denial of the motion to compel production or challenged the response to the subpoena; McCormick does not contend that the reports actually existed. Moreover, Manitou NA was certainly not the only source or avenue relative to obtaining information regarding Manitou telehandler sales by competitors in McCormick's exclusive territory. See MCR 2.310(B)(1) and (D) (discovery document requests to nonparties). Finally, McCormick maintains that, under the

---

[23] We note that Manitou NA did provide McCormick with information regarding the number of telehandlers that Manitou NA shipped to the state of Michigan for each of the years spanning 2000 through 2009 and the total dollar amount of those sales. McCormick, however, did not utilize this information at trial. In seeking to quash the subpoena, Manitou NA did indicate that if its computer system were mined or explored, the information on territorial sales could probably be pieced together, but there were no existing or prepared reports as characterized by McCormick in its subpoena. McCormick did not pursue the matter.

2000 exclusivity or side agreement, Manitou NA expected that McCormick would increase its sales by 10 percent each year.  First, this was not an expectation, but a requirement.  And regardless of whether it was an expectation or a requirement, the provision, in and of itself, certainly did not establish and was not evidence that the 10-percent threshold was actually met.

MCR 2.611(E)(1) provides:

> If the court finds that the only error in the trial is the inadequacy or excessiveness of the verdict, it may deny a motion for new trial on condition that within 14 days the nonmoving party consent in writing to the entry of judgment in an amount found by the court to be the lowest (if the verdict was inadequate) or highest (if the verdict was excessive) amount the evidence will support.

Remittitur is justified when a jury verdict is excessive, i.e., when the amount awarded is greater than the highest amount supported by the evidence.  *Heaton v Benton Constr Co*, 286 Mich App 528, 539; 780 NW2d 618 (2009).  The $1.3 million damage award on the MFUEA counterclaim was greater than the highest amount supported by the evidence, and the trial court abused its discretion in denying Manitou NA's motion for remittitur relative to the MFUEA damages.  *Id.* at 538.  At most, the evidence supported an award based on the lost profits associated with the 11 telehandler sales discussed above, $69,000.  Accordingly, we vacate the $1.3 million damage award and remand for remittitur proceedings consistent with our ruling and MCR 2.611(E)(1).

Next, Manitou NA challenges the $3.85 million award in damages with respect to the MARA counterclaim, arguing that the award bore no conceivable relationship to a MARA violation.  We disagree.  "[A]n antitrust plaintiff's damages should reflect the difference between its performance in a hypothetical market free of all antitrust violations and its actual performance in the market infected by the anticompetitive conduct."  *Nat'l Farmers' Org, Inc v Associated Milk Producers, Inc*, 850 F2d 1286, 1306 (CA 8, 1989).  In *Brunswick Corp*, 429 US at 489, the United States Supreme Court stated:

> Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations would be likely to cause. [Citation, quotation marks, and ellipsis omitted.]

The anticompetitive conduct here arose from the non-solicitation clause in the 2004 agreement and precluded McCormick from participating in the sale of Gehl telehandlers.  The $3.85 million award was based on lost business income, which was reflected, at least to the extent of $3.82 million, on the 2008 tax return for Mr. and Mrs. McCormick.  More specifically, Schedule C (Profit or Loss from Business), as attached to the return, indicated that there was business income of $1,555,700, that the cost of goods sold was $4,434,339, and that there was "other income" of $10,316.  Adding together the income and subtracting the cost of goods resulted in a negative gross income of $2,868,323.  Next, total business expenses amounted to $951,793, which was added to the negative gross income of $2,868,323, resulting in a business

loss of $3,820,116. Mr. McCormick testified that the $1,555,700 amount represented the income generated by selling the equipment in McCormick's inventory after the bank called in the note on McCormick's line of credit that had financed the purchase of the equipment. Mr. McCormick further testified that the $4,434,339 amount represented the cost of the liquidated equipment. Mr. McCormick testified that the MARA violation absolutely destroyed the business.

The jury was instructed that "[b]usiness valuation is not an acceptable measure of damages in this case[,]" which was consistent with a pretrial decision made by the trial court in which the court ruled that McCormick would not be "permitted to introduce any evidence of damages concerning the value of its business[.]" In its order denying Manitou NA's motion for remittitur, the trial court rejected Manitou NA's argument that the $3.85 million award effectively constituted business-valuation damages. The court found that the dollar amounts in the 2008 income tax return "provided an appropriate basis for the [j]ury's verdict." We agree with this assessment; the loss from liquidation of McCormick's inventory was not the same as damages predicated on a business valuation.[24] Furthermore, we conclude, contrary to Manitou NA's appellate argument, that there was a sufficient correlation or causal connection between the MARA violation and the business loss attributable to the liquidation of McCormick's equipment. Absent the ability to engage in the telehandler marketplace through the sale of Gehl telehandlers, many of which were now being manufactured or designed by Manitou, as precluded by the non-solicitation provision in the 2004 OEM Supply Agreement, McCormick could no longer carry on business and was forced to liquidate its inventory. Mr. McCormick's testimony, along with the testimony of others, supports this conclusion. McCormick's actual performance in the market, as infected by the anticompetitive conduct, was to cease performance. And the business-loss injury was of the type that the MARA was intended to prevent and flowed from Manitou NA's unlawful acts.

Manitou NA argues that there was only evidence that Gehl would not accept McCormick's request to purchase 10 telehandlers, which was entirely insufficient to support the $3.85 million award, and which would only have supported an award of lost profits on 10 unconsummated sales. This argument misses the whole point with respect to the relevance of the rejected purchase of 10 telehandlers from Gehl. The evidence helped establish that the non-solicitation provision in the 2004 agreement was indeed going to be honored by Manitou NA and Gehl, making it futile for McCormick to attempt any more purchases of Gehl telehandlers or to become a Gehl dealer, leading McCormick to close down its shop and liquidate its inventory.

---

[24] Moreover, the trial court ultimately allowed the jury to consider the business loss identified in the 2008 tax return in assessing damages, and, except for a discovery-sanction argument, Manitou NA has not challenged that decision on appeal, nor does it argue that the 2008 tax return was irrelevant and thus should not have been admitted into evidence. We do agree with Manitou NA that the business loss reflected in the 2008 tax return did not represent lost profits, but, despite the mischaracterization at times by McCormick's counsel, the loss was nonetheless a proper measure of MARA damages.

Manitou NA complains that the $951,793 in business expenses listed in the 2008 tax return, which amount increased the overall business loss, had no connection to the MARA violation, as it simply pertained to ordinary expenses that would have been incurred regardless of any MARA violation. First, examination of the tax return does not necessarily support this proposition. And Mr. McCormick did testify that the total loss identified on the tax return was tied to the liquidation of the inventory. Moreover, Manitou NA's argument would not justify vacating the entire award, and Manitou NA does not argue that remittitur is necessary relative to the business expenses. Likewise, Manitou NA does not contend that remittitur is necessary on the basis that the $3.85 million award exceeded the $3.82 million amount reflected in the 2008 tax return. Instead, Manitou NA's remittitur argument is based solely on the 10 lost telehandler sales. However, as discussed earlier, this is not a valid ground to reduce the damage award, as those lost sales revealed that McCormick would not be able to sell telehandlers through Gehl under the 2004 agreement, creating a loss that went way beyond the lost profit on those 10 telehandlers.

In sum, we affirm the verdicts to the extent that they found MFUEA and MARA violations, and we affirm the damage award with respect to the MARA violation. However, we vacate and remand for remittitur proceedings under MCR 2.611(E)(1) in regard to the damage award relative to the MFUEA violation, as it was based on an overly speculative claim of lost profits.[25]

Affirmed in part, vacated and remanded in part. We do not retain jurisdiction. Neither party having fully prevailed on appeal, we decline to award taxable costs under MCR 7.219.


/s/ Donald S. Owens
/s/ William B. Murphy
/s/ Joel P. Hoekstra

---

[25] With respect to Manitou NA's argument that the trial court should have excluded McCormick's evidence on damages as a discovery sanction, given its last minute change in its approach to damages, including discarding the employment of its expert and his damage computations, the argument was not preserved below and we need not address it. *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234; 507 NW2d 422 (1993) ("Issues raised for the first time on appeal are not ordinarily subject to review."). Moreover, on examination of the record and contemplation of the pertinent factors, exclusion of the evidence as a discovery sanction would not have been justified. *Dean v Tucker*, 182 Mich App 27, 32-33; 451 NW2d 571 (1990). That said, our ruling should not be viewed as approving of McCormick's actions. Additionally, with regard to the damages related to McCormick's MFUEA claim and Manitou NA's assertion that the jury improperly awarded gross lost profits instead of net lost profits, the issue has been rendered moot in light of our ruling on the MFUEA damages. Further, this issue was also unpreserved below.